KEVIN A. DARBY, NVSB# 7670
TRICIA M. DARBY, NVSB# 7959
DARBY LAW PRACTICE, LTD.
4777 Caughlin Parkway
Reno, Nevada  89519
Telephone: 775.322.1237
Facsimile:  775.996.7290
kad@darbylawpractice.com
tricia@darbylawpractice.com
Attorneys for Debtor/Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

ALY EATERY, INC,

          Debtors.

_____/

CASE NO.:    BK-N-20-50471-BTB
Chapter 11 Subchapter V

**DECLARATION OF ALICIA YOUNGBERG IN SUPPORT OF MOTION TO ASSUME LEASE OF NONRESIDENTIAL REAL PROPERTY: 5015 S. MCCARRAN BLVD, RENO, NV 89502**

Hearing Date:  *See Notice of Hearing*
Hearing Time:

ALICIA YOUNGBERG, under penalty of perjury, states as follows:

1.    I am the sole officer, director and shareholder of the Debtor, Aly Eatery, Inc.

2.    On May 5, 2020, Debtor filed a voluntary petition for relief under Chapter 11 Subchapter V of the United States Bankruptcy Code.

3.    The Debtor owns and Subway Sandwiches franchised restaurant located at 5105 S. McCarran Blvd., Reno, Nevada (the "Business Premises").

4.    Debtor leases the Business Premises from Pacific Castle Management and/or Subway Real Estate, LLC (collectively the "Landlord") pursuant to the terms of a written lease agreement dated August 29, 1990, a copy of which is attached to this declaration as Exhibit 1 (the "Lease").

///

5.      Attached as Exhibit 2 to this declaration is the Seventh Amendment to the Lease, which extended the term of the Lease through January 31, 2022.

6.      Monthly rent plus monthly common area maintenance fees currently average approximately $3,550 per month.

7.      Debtor is current on all financial obligations under the Lease and will continue to timely remit all payments required under the Lease as they become due.

8.      The Debtor, in its business judgment, has determined that the Lease is essential to Debtor's business operations and successful reorganization.  Debtor's income is produced from the Business Premises and that property cannot be substituted or replaced.  The Business Premises has been recently improved and remodeled to meet the requirements of the Subway parent corporation and requires no immediate repairs or maintenance.

9.      I believe the assumption of the Business Premises Lease is in the best interests of the Debtor, its bankruptcy estate and its creditors

DATED this 5th day of May, 2020.

*/s/ Alicia Youngberg*

_____
ALICIA YOUNGBERG

**EXHIBIT 1**

**EXHIBIT 1**

SMITHRIDGE PLAZA

RENO, NV.

LEASE FOR

SUBWAY REAL ESTATE CORPORATION

Bay 511 Corporation

c/o COMMERCIAL PROPERTY SERVICES
925 W. Moana Lane
Reno, NV. 89509

SMITHRIDGE PLAZA
LEASE AGREEMENT

## TABLE OF CONTENTS

Page

1.  SALIENT LEASE TERMS ........................................... 1
2.  PARTIES ........................................................ 1
3.  DESCRIPTION .................................................... 1
4.  USES PROHIBITED ................................................ 2
5.  TERM ........................................................... 2
6.  PRE-TERM POSSESSION ............................................ 3
7.  POSSESSION ..................................................... 3
8.  MINIMUM RENTAL ................................................. 4
9.  PERCENTAGE RENTAL .............................................. 4
10. PROMOTIONAL PROGRAM ............................................ 6
11. OPERATING COVENANT ............................................. 6
12. ACCORD AND SATISFACTION ........................................ 7
13. LEASE DEPOSIT .................................................. 7
14. TAXES AND ASSESSMENTS .......................................... 7
15. MAINTENANCE OF PREMISES ........................................ 8
16. COMMON AREAS ................................................... 9
17. WASTE ALTERATIONS ............................................. 10
18. FREE FROM LIENS ............................................... 10
19. COMPLIANCE WITH GOVERNMENTAL REGULATIONS ...................... 10
20. LIABILITY AND PLATE GLASS INSURANCE ........................... 10
21. INDEMNIFICATION OF LESSOR AND WAIVER OF CLAIMS ................ 11
22. FIRE INSURANCE ................................................ 11
23. LESSEE PROPERTY DAMAGE INSURANCE .............................. 12
24. WAIVER OF SUBROGATION ......................................... 12
25. ADVERTISEMENTS AND SIGNS ...................................... 12
26. UTILITIES ..................................................... 13
27. ENTRY BY LESSOR ............................................... 13
28. DESTRUCTION ................................................... 13
29. CONDEMNATION .................................................. 14
30. ASSIGNMENT AND SUBLETTING ..................................... 15
31. COVENANT NOT TO COMPETE ....................................... 18
32. ABANDONMENT ................................................... 18
33. DEFAULT ....................................................... 18
34. REMEDIES UPON DEFAULT ......................................... 19
35. FORFEITURE OF PROPERTY AND LANDLORD'S LIEN .................... 20
36. SURRENDER OF LEASE ............................................ 20
37. SUBORDINATION ................................................. 21
38. EMPLOYEE PARKING .............................................. 21
39. NOTICES ....................................................... 21
40. TRANSFER OF SECURITY .......................................... 21
41. WAIVER ........................................................ 21
42. HOLDING OVER .................................................. 21
43. LIMITATION ON LESSOR'S LIABILITY .............................. 21
44. LATE CHARGES .................................................. 22
45. SUCCESSORS AND ASSIGNS ........................................ 22
46. TIME .......................................................... 22
47. MARGINAL CAPTIONS ............................................. 22
48. EFFECT OF LANDLORD'S CONVEYANCE ............................... 22
49. DEFAULT OF LESSOR ............................................. 22
50. OFFSET STATEMENTS ............................................. 22
51. ATTORNEY'S FEES ............................................... 22
52. WAIVER OF CERTAIN PROVISIONS .................................. 23
53. LESSEE'S COVENANTS ............................................ 23
54. NO PARTNERSHIP ................................................ 24
55. BANKRUPTCY .................................................... 24
56. MISCELLANEOUS PROVISIONS ...................................... 25

This lease is dated for reference purposes only the <u>29 th</u> day of <u>August</u>, 19 <u>90</u>.

## SALIENT LEASE TERMS

1.1  General Location:  Smithridge Plaza, Reno, Nevada          (Section 3.1)

1.2  Lessor:  Bay 511 Corporation
              c/o COMMERCIAL PROPERTY SERVICES
              925 W. Moana Lane
              Reno, NV.  89509

     Lessee:  <u>SUBWAY REAL ESTATE CORP</u>

              325 Bic. Drive  Milford Ct.   Attention:  Legal Department

                                                    (Sections 1.2 & 39.1)

1.3  Approximately _____ 1088 _____ square feet.   (Section 3.2)

1.4  Uses:  Solely for <u>A restaurant for on and off premises consumption of submarine</u>
            <u>sandwiches and related items</u>

                                                    (Section 1.4)

1.5  Term:  (a) _____ 60 _____ months
            (b) Days After Delivery for Term Commencement: _____
                          90
            (c) Outside Delivery Date <u>September 15, 1990</u>

                                                    (Section 8.1)

1.6  Rent:  (a) Minimum Rent:  <u>$1,621.12 per month</u>

            (b) Adjustment: _____ 4% annually _____

                                                    (Section 8.1)

            (c) Adjustment Dates: <u>Annually</u>

                                                    (Section 8.2(a))

            (d) Percentage Rent: _____ 6% _____

                                                    (Section 9.1)

            (e) Advance Rent: _____ -0- _____

                                                    (Section 13.1)

1.7  Security Deposit: _____ $1,600.00 _____

                                                    (Section 13.1)

1.8  Promotional Program Expense: _____ .50 per sq. ft. per year _____

                                                    (Section 10.1)

1.9  Initial prorata share _____ .007 _____ ( %) (This percentage
     may change and is non-binding).

1.10  Lease to Contain:
        Pages 1 through _____ 26 _____
        Sections 1.1 through 56.4
        Addenda (if any) _____ B _____
        Exhibits:  A - Legal description of shopping center
                   B - Site Plan (subject to alteration) with demised
                       premises outlined
                   C - Construction exhibit - if any
                   D - Acknowledgement of Commencement
                   E - Rules & Regulations
                   F - Sign Criteria
                   G - Guaranty  Z   Additional Provisions
                   AD - Agency Disclosure

                              -1-



WITNESSETH

PARTIES

2..     This lease is made between the Lessor and the Lessee described in Section 1.2 hereof.

DESCRIPTION

3.1     Lessor hereby leases to Lessee, and Lessee hires from Lessor, a portion of those certain premises with appurtenances, situated as described in Section 1.1 hereof and more particularly described in Exhibit "A," attached hereto and made a part hereof.

3.2     The portion leased herein is delineated on the plat attached hereto marked Exhibit "B," which is made a part hereof by reference, consisting of the approximate number of square feet as specified in Section 1.3 hereof. The Exhibit "B" property is hereinafter referred to as the "Shopping Center" or the "Shopping Complex." The portion leased to Lessee is hereinafter referred to as the "demised premises," the "leased premises" or "the premises." The exterior walls and exterior portions of the leased premises, the area beneath said premises, and the area above said premises are not demised hereunder, and the use thereof together with the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires, and structural elements leading through the leased premises serving other parts of the Shopping Complex are hereby reserved unto Lessor. Such reservation in no way affects maintenance obligations imposed herein.

3.3     This Lease shall be subject and subordinate to all exceptions of record, including without limitation, that Declaration of Establishment of Protective Covenants, Conditions and Restrictions and Grants of Easements, which Declaration was recorded on June 12, 1981, the First Amendment to said Declaration, the Joinder and Ratification of said Declaration, all of which have been recorded in the office of the County Recorder of Washoe County.

USES
PROHIBITED

4.1     As an express and material consideration to the Lessor for entering into this lease, the premises shall be used solely for the purposes specified in Section 1.4 hereof and for no other purpose. Lessee shall not use, or permit said premises, or any part thereof, to be used, for any purpose or purposes other than the purpose or purposes stated hereinabove.

4.2     Should any of the above uses of the premises, or any acts done in conjunction therewith, increase the rate of insurance above that for the least hazardous retail use in the Shopping Center in which said premises may be located, said increased premium costs shall be borne exclusively by the Lessee. The Lessee shall not engage in any activities or permit to be kept, used, or sold in or about the premises, any article which may be prohibited by the standard form of fire insurance policies. Lessee shall, at its sole cost and expense, comply with any and all requirements, pertaining to said premises, of any insurance organization or company, necessary for the maintenance of reasonable fire and public liability insurance covering said building and appurtenances.

4.3     In no event shall more than 15% of the square footage in the premises be used for other than selling purposes. Non-selling areas shall include storage, bathrooms, offices, and other areas not directly used for the display and sale of merchandise to retail customers in the ordinary course of business.

TERM

5.1     The term of this lease shall commence the number of days specified in Section 1.5(b) hereof after delivery of the premises to Lessee or when Lessee opens for business, whichever is the first to

- 2 -



occur, and, unless sooner terminated as hereinafter provided, shall continue for the number of months specified in Section 1.5(a) hereof, plus any partial month at the commencement of the term. Lessor agrees to deliver possession of the premises to Lessee, and Lessee agrees to accept the same from Lessor upon notice from Lessor to Lessee that the portion of Lessor's work relating to the premises which is scheduled for completion prior to the commencement of Lessee's work has been substantially completed as specified in Exhibit "C" attached hereto and incorporated herein by reference. If despite Lessor's best efforts, said premises so improved shall not be delivered by the date specified in Section 1.5(c) hereof, any remaining work shall be completed by the Lessor with reasonable dispatch, but not later than ninety (90) days thereafter, provided that said date shall be extended for a period equal to the time construction has been delayed due to causes beyond the reasonable control of the Lessor, including, without limitation, strikes, lockouts, or other labor disturbances, governmental orders, regulations, or embargoes, shortages of materials, inclement weather, fire, flood or other casualty. Lessor's liability hereunder shall be restricted to abatement of rent for the period of any such delay. The term shall also include the portion of a calendar month, if any, immediately following commencement.

5.2    If the term of this lease has not commenced within twelve (12) months from the date of execution hereof, either party may cancel this lease at any time thereafter, by written notice to the other prior to the commencement date.

5.3    If the term of this lease has not commenced within three (3) years from the date of execution hereof, it shall be automatically terminated.

5.4    After delivery of the premises to Lessee, Lessor shall execute a written acknowledgment of the date of commencement and shall attach it to this lease designated as Exhibit "D" and by this reference it shall be incorporated herein.

PRE-TERM
POSSESSION

6.1    The Lessor may notify the Lessee when the premises are ready for Lessee's fixturing and preparation for opening, but prior to substantial completion of the premises by the Lessor. Lessee may thereupon enter the premises for such purposes at its own risk, to make such improvements as the Lessee shall have the right to make, to install fixtures, supplies, merchandise and other property. Lessee agrees that it shall not in any way interfere with the progress of the Lessor's work by such entry. Should such entry prove an impediment to the progress of the Lessor's work, in the Lessor's judgment, the Lessor may demand that the Lessee forthwith vacate the premises until such time as the Lessor's work is complete, and Lessee shall immediately comply with such demand.

6.2    During the course of any such pre-term possession, whether such pre-term period arises because of an obligation of construction on the part of Lessee, or otherwise, all terms and conditions of this lease, except for rent and commencement, shall apply, with specific reference to indemnity (Article 21 herein), by Lessee of Lessor for all occurrences within the premises.

POSSESSION

7.    If Lessor, for any reason whatsoever, cannot deliver possession of the said premises to Lessee at the commencement of the said term, as hereinbefore specified, this lease shall not be void or voidable, nor shall Lessor be liable to Lessee for any loss or damage resulting therefrom; but in that event there shall be an abatement of rent for the period between the commencement of the said term and the time when Lessor can deliver possession.



MINIMUM
RENTAL

8.1    The minimum rental during the term of said lease, all of which shall be payable to Lessor at the address specified for notices herein (see Section 1.2 hereof), or such other place as the Lessor shall designate in writing, shall be as specified in Section 1.6(a) hereof as adjusted, if applicable, in accordance with the terms of Section 1.6(b) hereof.

8.2    (a)    The minimum rental provided for herein shall be subject to increase ~~after each number of months following commencement hereof as specified in Section 1.6(e) ("the adjustment dates") as follows:~~ in the following manner after the sixth lease year.

The base for computing the increase is the Consumer Price Index, all urban consumers, all items, San Francisco/Oakland Bay Area, published by the United States Department of Labor, Bureau of Labor Statistics, in which 1967 equals one hundred (100) ("Index"), which is published for the last month prior to the commencement of the term hereof (beginning index). If the Index published nearest the adjustment date ("Extension Index"), has increased over the beginning index, the minimum rental until the next rent adjustment date shall be established by multiplying the minimum rent as specified in the first Section of this article, by a fraction, of the numerator of which is the extension index and the denominator of which is the beginning index. In no event, however, shall the minimum rental established at the adjustment date be less than the minimum rental established at the previous adjustment date or as established in the first paragraph of this article, whichever last occurred. On adjustment of the minimum rent as provided herein, the parties shall immediately execute an amendment to the lease on request of either party stating the new minimum rent.

(b)    If the Index is changed so that the base year differs from that used as of the month immediately preceding the month in which the term commences, the Index shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If the Index is discontinued or revised during the term, such other government index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if the Index has not been discontinued or revised.

8.3    All rentals shall be paid without deduction or offset, each month in advance, on the first day of each calendar month during said term. If the lease commences on other than on the first day of a calendar month, the rent for the first partial month shall be prorated accordingly.

PERCENTAGE
RENTAL

9.1    In addition to the minimum monthly rental hereinabove agreed to be paid by Lessee, Lessee will pay to Lessor at the times and in the manner herein specified, an additional rental in an amount equal to the percentage specified in Section 1.6(d) hereof of the amount of Lessee's gross sales made in, upon or from the demised premises during each calendar year of the term hereof less the aggregate amount of the minimum rental previously paid by the Lessee for said calendar year.

9.2    The term "gross sales" as used herein, shall include the entire gross receipts of every kind and nature from sales and services made in, upon or from the demised premises, whether upon credit or for cash, in every department operating in the demised premises, whether operated by the Lessee, or by a sublessee or sublessees, or by a concessionaire or concessionaires, excepting therefrom any rebates and/or refunds to customers, and the amount of all sales tax or similar tax receipts which have to be accounted for by Lessee to any

- 4 -



government or governmental agency. Sales upon credit shall be deemed cash sales, whether or not payment be actually made therefor.

9.3    Within twenty (20) days after the end of each calendar year of the term hereof, commencing with the twentieth day following the end of the first calendar year of the term hereof and ending with the twentieth day of the month next succeeding the last month of the lease term, Lessee shall furnish to Lessor a statement in writing, certified by Lessee to be correct, showing the total gross sales made in, upon or from the demised premises during the preceding calendar year, ~~and shall accompany each such statement with a payment to Lessor equal to the percentage specified in section 1.6(d) hereof of the total quarterly gross sales made in, upon or from the demised premises during each such calendar quarter, less the minimum rent for such calendar quarter, if previously paid.~~ Said payments of percentage rental shall be adjusted annually as of December 31st of each year, so that the total rent payable during each calendar year shall be the greater of either (a) the total minimum rent for said year or (b) the percentage specified in section 1.6(d) hereof of gross sales during said year less the credits and deductions herein authorized. Tenant shall report sales quarterly, but pay percentage on annual basis.

9.4    The Lessee shall keep full, complete and proper books, records and accounts of its daily gross sales, both for cash and on credit, of each separate department or concession at any time operated in the demised premises. The Lessor and his agents and employees shall have the right at any and all times, during regular business hours, to examine and inspect all of the books and records of the Lessee, pertaining to the business of the Lessee conducted in, upon or from the demised premises which Lessee shall produce upon demand by Lessor or his agents for the purpose of investigating and verifying the accuracy of any statement of gross sales. Lessee shall submit to Lessor copies of all sales tax reports prepared for any governmental authority, within ten (10) days of their due date. Lessee shall further submit to Lessor copies of any audit performed by a certified public accountant upon the Lessee's books and records, within ten (10) days following the date that such audit is completed by such CPA. The Lessor may once in any lease year cause an audit of the gross sales of Lessee to be made by an independent certified public accountant of Lessor's selection, and if the statement of gross sales previously made to Lessor by Lessee shall be found to under-state Lessee's gross sales by two percent (2%) or more than the amount of Lessee's gross sales shown by such audit, Lessee shall immediately pay to Lessor the cost of such audit, as well as the additional rental shown to be payable by Lessee to Lessor; otherwise the cost of such audit shall be paid by Lessor.

9.5    The acceptance by Lessor of any moneys paid to Lessor by Lessee as additional rental for the leased premises as shown by any yearly statement furnished by Lessee shall not be an admission of the accuracy of the yearly statement or of any of the quarterly state-ments furnished by Lessee during the year reported therein, or of the sufficiency of the amount of such additional rental payment, but Lessor shall be entitled at any time within two (2) years after the receipt of any such additional rental payment to question the sufficiency of the amount thereof and/or the accuracy of the statement or statements furnished by Lessee to justify such amount. Lessee shall, for said period of two (2) after submission to Lessor of any such statement, keep safe and intact all of Lessee's records, books, accounts and other data which in any way relate to or are required to establish in detail Lessee's gross sales and any authorized deductions therefrom as shown by any such statement, and shall upon request make the same available to Lessor, Lessor's [written

- 5 -



auditor, representative or agent for examination at any time during said three (3) year period.

**PROMOTIONAL
PROGRAM**

10.1   Lessor, at Lessor's election, may conduct, or cause to be conducted, an advertising, promotional and public relations program for the general purpose of furthering the interest of all tenants in the Shopping Complex. In the event Lessor so elects, Lessor shall determine in its sole discretion the composition and manner of implementation of such program. Each month Lessee shall pay to Lessor, as a contribution to the cost of such program, the sum determined by multiplying the promotional program expenses specified in Section 1.8 hereof by the rentable area of the premises, provided that such sum shall be adjusted upward each calendar year commencing January 1 of the year following commencement of the lease term, in direct proportion to any increase in the Consumer Price Index which occurred since the calendar year in which this lease commenced. Such adjustments shall be made in the same manner as adjustments to the minimum rental as provided in Section 8.2(a) hereof, except that such adjustments shall be made annually as provided in this Section 10.1. Lessee's contribution shall be paid on or before the first day of each nd every calendar month during the term hereof, with appropriate proration on the basis of a thirty (30) day month if the term commences on other than the first day of a calendar month.

10.2   Notwithstanding the provisions of Section 10.1, Lessee shall become a member of a Merchants' Association of the tenants and/or occupants of the Shopping Center, whether such Merchants' Association exists at the commencement of this lease or shall be subsequently formed. Lessee shall maintain its membership in good standing throughout the term of this lease and any renewals and extensions thereof. Lessor hereby agrees to abide by the by-laws, rules and regulations of such Merchants' Association, and further agrees to pay within ten (10) days from receipt of a billing therefor, Lessee's proportionate share of the promotional and other expense of such Merchants' Association which are allocable to the lessees of the Shopping Center in accordance with the Merchants' Association by-laws from time to time in force and effect. Tenant acknowledges and agrees that Landlord, its employees, servants or agents shall have no liability for any acts or failure to act of the Merchants' Association, and Tenant shall not assert any claim for injury or damages against Landlord by reason of any injury or damages to person, property or business suffered by Tenant as a result of any act or failure to act, promotion or other activity of the Merchants' Association. Nothing in the by-laws or regulations of the said Merchants' Association shall be in conflict with the provisions of this lease, including, without limiting the generality of the foregoing, any reasonable rules and regulations as Landlord, in its sole discretion, from time to time promulgates for the best interests of the Shopping Center. Landlord shall have no liability for violation by any other Tenant in the Shopping Center of any rules or regulations, nor shall such violation or waiver thereof excuse Tenant from compliance.

**PERATING
OVENANT**

11.   Lessee shall continuously during the entire term, conduct and carry on Lessee's business in the demised premises, and shall keep the premises open for business and cause Lessee's business to be conducted therein during "normal business hours" as designated from time to time during the term of this Lease by Lessor; provided, however, that this provision shall not apply if Lessee's business shall be temporarily shut down on account of strikes, lockouts or causes beyond the control of Lessee.   Lessee shall keep the demised premises adequately stocked with merchandise, and with sufficient sales personnel to care for the patronage and conduct of said business in accordance with good business practices. In the event Lessee does



not so operate its business as specified herein, then Lessee shall pay Lessor, as additional rent, one-thirtieth (1/30th) of the monthly minimum rental for each day Lessee does not so operate. Such payment shall be in addition to the monthly minimum rental herein provided and shall compensate Lessor for the loss of percentage rental caused by Lessee's failure to so operate. Tenant may remain open untill 2:00 a.m.  Tenant may remain open seven (7) days a week.  *

**ACCORD AND SATISFACTION**

12.    No payment by Lessor or receipt by Lessor of a lesser amount of monthly rent or any other sum due hereunder, shall be deemed to be other than on account of the earliest due rent or payment, nor shall any endorsement or statement on any check or any letter accompanying any such check or payment be deemed an accord and satisfaction, and Lessor may accept such check or payment without prejudice to Lessor's right to recover the balance of such rent or payment or pursue any other remedy available in this lease, at law or in equity. Lessor may accept any partial payment from Lessee without invalidation of any contractual notice required to be given herein (to the extent such contractual notice is required) and without invalidation of any notice given or required to be given pursuant to applicable law.

**LEASE DEPOSIT**

13.1    Simultaneous with the execution of this lease, Lessee has deposited with Lessor the sum specified in Section 1.6(e) hereof, which sum shall be applicable to the first rent accruing under the terms of this lease. Additionally, and also simultaneous with the execution of this lease, Lessee has deposited the sum specified in Section 1.7 hereof which sum shall be held by the Lessor as security for the faithful performance by Lessee of all of the terms, covenants and conditions of this lease. Lessor may comingle said deposit with its other moneys and may deliver said deposit to any transferee of the reversion and thereupon be discharged from further liability relating thereto.

13.2    In event the Lessor uses any of the above-described lease deposit for the purpose of curing a Lessee default or otherwise performing a Lessee obligation, the Lessee shall immediately, upon request of the Lessor, reinstate the sum to be held as security for the faithful performance of its obligations.

13.3    If, on termination of this lease, the Lessee is not in default of any of its obligations hereunder, the remaining security deposit held by the Lessor shall be returned forthwith to the Lessee.

**TAXES AND ASSESSMENTS**

14.1    Lessee shall be liable for all taxes levied against personal property, trade fixtures and other property placed by Lessee in or on or about the demised premises including without prejudice to the generality of the foregoing, shelves, counters, vaults, vault doors, wall safes, partitions, fixtures, machinery, plant equipment and other articles and if any such taxes on Lessee's personal property, trade fixtures or property placed in the demised premises by Lessee are levied against Lessor or Lessor's property and if Lessor pays the same (which Lessor shall have the right to do regardless of the validity of such levy), or if the assessed value of Lessor's property is increased by the inclusion of the value placed in such property or trade fixtures of Lessee or placed in the demised premises by Lessee and if Lessor pays the taxes based on such increased assessment (which Lessor shall have the right to do, regardless of the validity thereof), Lessee, upon demand shall, as the case may be, pay to the Lessor the taxes so levied against Lessor or the proportion of such taxes resulting from such increase in the assessments.

14.2    Lessee shall pay, as additional rent, all taxes and assessments levied or assessed against the land and buildings of which the demised premises form a part, including the common areas, as well as
* Landlord acknowledges that Tenant shall have the right to close the business in order to retake the premises from its franchisee, but for no more than a thirty (30) day period.

- 7 -



the improvements and the buildings and improvements on said land, prorated on the basis that the number of square feet occupied by Lessee in the said building or Shopping Center bears to the gross leaseable area in the entire building or Shopping Center which is included in the tax bill.

14.3   If any general or special assessment is levied and assessed against the premises, Lessor may elect to either pay the assessment in full or allow the assessment to go to bond. If Lessor pays the assessment in full, Lessee shall pay to Lessor each time a payment of real property taxes is made, a sum equal to that which would have been payable (as both principal and interest), had Lessor allowed the assessment to go to bond.

14.4   The term "taxes and assessments" as used herein shall include all real property taxes on the building, the land on which the building is situated, and the various estates in the building and the land. The term "taxes and assessments" shall also include all personal property taxes levied on the property used in the operation of the building; taxes of every kind and nature levied and assessed in lieu of, in substitution for, or in addition to, existing or additional real or personal property taxes on the building, land, or personal property, whether or not now customary or within the contemplation of the parties to this lease including the costs to Lessor of any contest with respect to such taxes or their validity, as well as a tax, fee or excise on rents, the square footage of the premises, the act of entering into this lease, or on the occupancy of the Lessee, or any other tax, fee or excise, however described.

14.5   If Lessee shall in good faith desire to contest the validity or amount of any tax, assessments, levy or other governmental charge herein agreed to be paid by Lessee, Lessee shall be permitted to do so, upon giving twenty (20) days' written notice thereof prior to the commencement of any such contest and indemnifying the Lessor against any governmental charge, penalty, costs, liability or damage arising out of any such contest. At all events, the Lessee must make prompt payment prior to delinquency of any such tax or charge, irrespective of the contest, and seek a rebate thereof in event such contest is successful.

14.6   Any and all rebates on account of any such taxes, rates, levies, charges or assessments required to be paid and paid by Lessee under the provisions of this lease shall belong to Lessee, and Lessor will, upon request of Lessee, execute any receipts, assignments or other acquitances that may be necessary in the premises in order to secure the recovery of any such rebates, and will pay over to Lessee, its proportionate share of any such rebates that may be received by Lessor.

**MAINTENANCE OF PREMISES**

15.1   Lessee shall, at its sole cost, keep and maintain each and every portion of the premises and appurtenances (excepting structural aspects of the exterior walls and structural aspects of roofs which Lessor agrees to repair), including glazing, any store front and the interior of the premises, in clean, good and sanitary order, condition and repair, ~~hereby waiving all right to make repairs or replacements at the expense of Lessor~~. Lessee shall also keep the walkways in front of the premises free from any debris, papers or dirt. As of commencement of the term hereof, Lessee accepts the premises as being in good and sanitary order, condition and repair, and agrees on the last day of said term, or sooner termination of this lease, to surrender unto Lessor said premises and appurtenances in good condition and repair, reasonable use and wear thereof and damage by fire excepted, and to remove all of the Lessee's signs from said premises, and to repair any damage caused by such removal.

– 8 –



15.2 Lessor shall maintain the heating, ventilating and air conditioning system installed to service the premises, including the repair and replacement thereof, at the cost of the Lessee. Lessor shall, further, at the expense of the Lessee, maintain a service contract for the regular maintenance of the heating, ventilating and air conditioning equipment with a reputable service company of its choice. Lessee shall reimburse Lessor for all costs in connection with this service in the same manner as specified for common area costs in Section 16.3.

**COMMON AREAS**

16.1 Common areas herein referred to means all areas and facilities outside the demised premises and within the exterior boundaries of the Shopping Center of which the demised premises form a part, that are provided and designated by the Lessor from time to time for the general use and convenience of the Lessee and of other lessees of the Lessor having the common use of such areas, and their respective authorized representatives and invitees. Common areas include, without limitation, upper levels, walkways, restrooms, elevators, pedestrian entrances, landscaping, sidewalks, landscaped areas, courtyards, hallways, parking areas and facilities, all as shown on Exhibit "B" attached hereto. Lessor shall give Lessee written notice of any rule change. Landlord will not reasonably inhibit access to or visibility of the demised premises.

16.2 Lessor shall, in Lessor's sole discretion, maintain the common areas, establish and enforce reasonable rules and regulations concerning such areas, close any of the common areas to whatever extent required in the opinion of Lessor's counsel to prevent a dedication of any of the common areas or the accrual of any rights of any person or of the public to the common areas, close temporarily any of the common areas for maintenance purposes, and make changes to the common areas including, without limitation, changes in the location of driveways, entrances, exits, vehicular parking spaces, parking area, the direction of the flow of traffic or construction of additional buildings thereupon, without any restriction whatsoever. The initial Rules and Regulations concerning the Shopping Complex are attached hereto as Exhibit "E." Lessor reserves the right to make additional reasonable rules affecting the Shopping Complex throughout the term hereof.

16.3 Lessee shall pay to Lessor, as additional rent, its proportionate share of common area costs within ten (10) days of receiving a bill therefor from the Lessor, which shall be no more frequently than monthly. Lessee's proportionate share of common area costs shall be that fraction of the total common area costs that the total number of square feet in the premises bears to the gross leasable area in the buildings having the use of the common areas. Lessor may bill the Lessee estimated charges for common area costs provided that such costs are adjusted annually to reflect the actual costs incurred in the previous year. Upon computation of the actual costs, the party owing the sum of money needed to adjust the Lessee's contribution to actual figures shall remit to the other the balancing sum within ten (10) days of receiving a statement therefor from the Lessor, if the Lessee's estimated payments have been insufficient, or within sixty (60) days following the close of the calendar year, if Lessee has paid in excess of its share.

16.4 "Common area costs," means all sums expended by the Lessor for the maintenance and operation of the common areas, and an allowance to the Lessor for Lessor's supervision of the maintenance and operation of the common areas in an amount equal to ten percent (10%) of the total common are cost. Costs for maintenance and operation of the common area shall include without limitation, costs of resurfacing, repainting and restriping, painting (including exterior building painting), sweeping and other janitorial and security services, maintenance of restrooms, elevators, walkways, pedestrian entrances, repairs and replacements, policing, purchase, construction

- 9 -



and maintenance of refuse receptacles, planting and landscaping, directories, signs and other markers, lighting and other utilities, the cost of Christmas decorations, ~~a reasonable depreciation allowance on improvements, machinery, and equipment used in connection with the common area~~, premiums on public liability and property damage insurance and other costs necessary in Lessor's judgment for the maintenance and operation of the common areas.

**WASTE**
**ALTERATIONS**

17.1    Lessee shall not commit, or suffer to be committed, any waste upon the premises, or any nuisance, or other act or thing which may disturb the quiet enjoyment of any other tenant in the building, or Shopping Center in which the demised premises may be located. Lessee shall not make, or suffer to be made, any alterations of the premises, or any part thereof, without the written consent of Lessor first had and obtained. Any additions to, or alteration of, the premises, except movable furniture and trade fixtures, shall become at once a part of the realty and belong to Lessor. The Lessee shall have the right to remove its trade fixtures and equipment placed upon the leased premises provided that Lessee restores the premises as indicated below.   Tenant may use its standard interior decor.

17.2    Lessee shall ascertain from Lessor at least thirty (30) days prior to the termination of this lease, whether Lessor desires the premises, or any part thereof, restored to their condition as existed prior to the making of permitted alterations, installations and improvements, and if Lessor shall so desire, then Lessee shall forthwith restore said premises to their original condition, entirely at its own expense, excepting normal wear and tear.

**FREE FROM**
**LIENS**

18.    Lessee shall keep the demised premises and the Shopping Center in which the demised premises are situated, free from any liens arising out of any work performed, materials furnished or obligations incurred by Lessee. If such a lien arises or is threatened, Lessor may pay the amount required to discharge the lien and recover such amount from the Lessee, as additional rent, together with all costs and attorney's fees incurred by the Lessor.

**COMPLIANCE**
**WITH**
**GOVERNMENTAL**
**REGULATIONS**

19.    Lessee, shall, at its sole cost and expense, comply with all of the requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the premises, and shall faithfully observe in the use of the premises all municipal ordinances and state and federal statutes now in force or which may hereafter be in force. The judgment of any Court of competent jurisdiction, or the admission of Lessee in any action or proceeding against Lessee, whether Lessor be a party thereto or not, that Lessee has violated any such ordinance or statute pertaining to the premises, shall be conclusive of that fact as between Lessor and Lessee.

**LIABILITY**
**AND PLATE**
**GLASS**
**INSURANCE**

20.    Lessee agrees to provide and keep in force for the benefit of the Lessor and Lessee, at Lessee's own cost and expense at all times during the term hereof, a liability insurance policy or endorsement on a blanket liability insurance policy insuring Lessor and Lessee against any and all damages and liability on account of or arising out of injuries to or the death of any person in or about the demised premises in a minimum amount of ONE MILLION DOLLARS ($1,000,000.00), for bodily and personal injuries and for damage to property. Lessee shall provide plate glass insurance satisfactory to Lessor, for all fixed and movable glass on or directly related to the premises. Said policies or endorsements shall be effected with insurance companies approved by Lessor, authorized to write liability insurance in the State in which the shopping center is located, and shall include coverage related to occupancy of premises, as well as

- 10 -



contractual liability, liquor liability, and products liability. Said policies shall designate specifically that Lessor is an additional named insured thereunder; such policies or certified copies thereof shall be delivered to Lessor. Said policies shall require that notice be afforded to Lessor of any cancellation, lapse, failure to renew or any material change in coverage at least thirty (30) days prior to the effective date of any such events. In no event shall any deductible for any of the policies described above exceed $500.00.

**INDEMNIFI-CATION OF LESSOR AND WAIVER OF CLAIMS**

21.1   Lessee, as a material part of the consideration to be rendered to Lessor, shall indemnify and hold harmless the Lessor from any loss by reason of injury to person or property, from whatever cause, all or in any way connected with the condition or use of the leased premises, or the improvements or personal property therein or thereon, including without limitation any liability or injury to the person or property of the Lessee, its agents, officers, employees or invitees. Lessee agrees to indemnify Lessor and hold it harmless from any and all liability, loss, cost or obligation on account of, or arising out of, any such injury or loss however occurring, including breach of the provisions of this lease and the negligence of the parties hereto.

21.2   In the event any action, suit or proceeding is brought against Lessor by reason of any such occurrence, Lessee, upon Lessor's request will at Lessee's expense resist and defend such action, suit or proceeding, or cause the same to be resisted and defended by counsel designated by the insuror whose policy covers the occurrence or by counsel designated by Lessee and approved by Lessor. The obligations of Lessee under this Section arising by reason of any occurrence taking place during the lease term shall survive any termination of this lease.

21.3   Lessee, as a material part of the consideration to be rendered to Lessor, hereby waives all claims against Lessor for damages to goods, wares, merchandise and loss of business in, upon or about the leased premises and for injury to Lessee, its agents, employees, invitees or third persons in or about the leased premises from any cause arising at any time, including breach of the provisions of this lease and the negligence of the parties hereto. Except if caused by the negligence of the Landlord, its agents or employees.

**FIRE INSURANCE**

22.1   Lessee, upon demand, shall pay to Lessor, as additional rent, its proportionate share of the premium for fire, extended coverage and other property insurance obtained by the Lessor on the premises and on the Shopping Center or building of which the premises form a part, including the common areas. Lessee's proportionate share shall be that fraction, the numerator of which is the number of square feet in the Lessee's premises, and the denominator of which is the total number of leaseable square feet in the building or buildings covered by such policies of insurance.

22.2   Additionally, the Lessee shall, upon demand, pay to the Lessor any increase in such insurance premium resulting to the overall cost on the building or buildings covered by such policies because of any special conditions relating to the Lessee's operations which require a higher premium. Lessor's insurance carrier or Lessor's insurance agent shall make the judgment as to the sum of money so involved, which judgment shall be conclusive.

22.3   No such insurance above-described may have a deductible in excess of $500.00.

22.4   No use shall be made or permitted to be made on the leased premises, nor acts done, which will increase the existing rate

- II -



of insurance upon the building in which the premises are located or upon any other building in the complex or cause the cancellation of any insurance policy covering the building, or any part thereof, nor shall Lessee sell, or permit to be kept, used or sold, in or about the leased premises, any article which may be prohibited by the standard form of fire insurance policies. Lessee shall, at its sole cost and expense, comply with any and all requirements, pertaining to the leased premises, of any insurance organization or company, necessary for the maintenance of reasonable property damage and public liability insurance, covering the leased premises, building and appurtenances.

**LESSEE PROPERTY DAMAGE INSURANCE**

23.    Lessee agrees at all times during the term of this lease, and at Lessee's sole expense, to keep all trade fixtures, equipment and merchandise of Lessee, or any subtenant of Lessee that may be in the premises from time to time, insured against loss or damage by fire or the hazards commonly referred to under the extended coverage endorsement, for an amount of ninety percent (90%) of full replacement value. The proceeds from any such insurance must be used by the Lessee to restore or replace any such trade fixtures, equipment and merchandise in the premises. No such insurance above described may have a deductible in excess of $500.00.

**WAIVER OF SUBROGATION**

24.1    Lessor and Lessee release each other, and their respective authorized representatives, from any claims for damage to any person or to the premises and the building and other improvements in which the premises are located, and to the fixtures, personal property, Lessee's improvements and alterations of either Lessor or Lessee, in or on the premises and the building and other improvements in which the premises are located, including loss of income, that are caused by or result from risks insured against under any property insurance policies carried by the parties and in force at the time of any such damage.

24.2    Each party shall cause each insurance policy obtained by it to provide that the insurance company waives all rights of recovery by way of subrogation against either party in connection with any damage covered by any policy. Neither party shall be liable to the other for any damage caused by fire or any other risks insured against under any property insurance policy required by this lease. If any such insurance policy cannot be obtained with a Waiver of Subrogation clause or rider without payment of an additional premium charge above that charged by the insurance companies issuing such policies without Waiver of Subrogation, the Lessee shall pay such additional premium to the insurance carrier requiring such additional premium.

**ADVERTISEMENTS AND SIGNS**

25.    [Except as provided in attached rider. Lessee shall not conduct or permit to be conducted any sale by auction on said premises. Lessee shall not place or permit to be placed on the premises any interior or exterior sign, advertisement, decoration, marquee or awning that is visible from the exterior of the premises without the prior written consent of Lessor which Lessor reserves the right to withhold in its sole judgment. Lessee, upon request of Lessor, shall immediately remove any such sign, advertisement, decoration, marquee or awning which, in the opinion of Lessor, is objectionable or offensive, and if Lessee fails so to do, Lessor may enter upon said premises and remove the same. Lessor has reserved the exclusive right to the exterior sidewalks, rear wall and roof of said premises, and Lessee shall not place or permit to be placed upon the said sidewalks, rear wall or roof, any sign advertisement or notice without the written consent of Lessor. At the termination of this lease, or any extension, Lessee shall remove all his signs provided that any damage caused by removal shall be repaired at Lessee's expense. All signs shall be maintained by Lessee



at his own expense. Except for approved signs, Lessee shall not use any advertising or promotional medium which may be heard or experienced outside of the premises (such as searchlights, barkers or loudspeakers). Lessee shall not distribute handbills or circulars to patrons of the Shopping Center or to cars in the parking lots, nor engage in any similar form of direct advertising in the Shopping Center. The initial sign criteria for the Shopping Complex (which Lessor may change from time to time, in Lessor's sole discretion) are attached hereto as Exhibit "F", and are incorporated herein by reference.

**UTILITIES**

26.    Lessee, from the time it first enters the premises for the purpose of setting fixtures, or from the commencement of this lease, whichever date shall first occur, and throughout the term of this lease shall pay for all charges (including, without limitation, connection fees) for water, gas, heat, sewer, power, telephone services and any other utility supplied to or consumed in or on the leased premises. Lessee shall not allow refuse, garbage, or trash to accumulate outside of the demised premises. Lessor shall not be responsible or liable for any interruption in utility services, nor shall such interruption affect the continuation or validity of this lease. Lessor's allocation of any utility charges emanating from a common meter shall be performed in good faith, and shall be conclusive upon the Lessee. All payments to Lessor in respect thereof shall be due within ten (10) days of billing.

**ENTRY BY LESSOR**

27.    Lessee shall permit Lessor and Lessor's agents to enter into and upon said premises at all reasonable times for the purpose of inspecting the same or for the purpose of maintaining the building in which said premises are situated, or for the purpose of making repairs, alterations or additions to any other portion of said building, including the erection and maintenance of such scaffolding, canopies, fences and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions or repairs, or for the purpose of placing upon the property in which the said premises are located ~~any usual or ordinary "for-sale" signs,~~ without any rebate of rent and without any liability to Lessee for any loss of occupation or quiet enjoyment of the premises thereby occasioned and shall permit Lessor and his agents, at any time within forty-five (45) days prior to the expiration of this lease, ~~to place upon said premises any usual or ordinary "to let" or "to lease"~~ signs and exhibit the premises to prospective tenants at reasonable hours. Lessee will give Lessor notice in writing five (5) days prior to employing any laborer or contractor to perform work resulting in an alteration of the leased premises so that Lessor may post a notice of non-responsibility. This section in no way affects the maintenance obligations of the parties hereto. *after notice, except in case of emergency. *No such alterations will materially hinder Tenant's business. *Tenant shall not be unreasonable for allowing Landlord access due to Tenants hours of operation.

**DESTRUCTION**

28.1 · In the event of (a) an uninsured casualty or a (b) casualty which cannot be repaired within one hundred twenty (120) days from the date of destruction under the laws and regulations of state, federal, county, municipal authorities or other authorities with jurisdiction, the Lessor may terminate this lease as at the date of the damage upon written notice to the Lessee following the casualty.

28.2 In the event of a casualty which may be repaired within one hundred twenty (120) days from the date of the damage, or, in the alternative, in the event the Lessor does not elect to terminate this lease under the terms of Section 28.1 above, then this lease shall continue in full force and effect and the Lessor shall forthwith undertake to make such repairs to reconstitute the leased premises to as near the condition as existed prior to the casualty as practicable. Such partial destruction shall in no way annul or void this lease except that Lessee shall be entitled to a proportionate reduction of

rent following the casualty and until the time the leased premises are restored (except if such casualty was caused by the negligence of the Lessee, in which case there shall be no abatement of rent). Such reduction shall be in the amount of that fraction of the minimum rent in which the numerator is the portion of the premises unoccupied during any such reconstruction and the denominator of which is the amount of square footage in the leased premises. Lessor's repair obligations shall in no way include any construction obligations originally hereunder imposed on the Lessee or subsequently undertaken by Lessee, but shall include solely that property constructed by Lessor prior to commencement of the term hereof.

28.3   Lessee hereby waives all statutory or common law rights of termination in respect to any partial destruction or casualty which Lessor is obligated to repair or may elect to repair under the terms of this Article. Further, in event of a casualty occurring during the last two (2) years of the original term hereof or of any extension, Lessor need not undertake any repairs and may cancel this lease unless the Lessee has the right under the terms of this lease to extend the term for an additional period and does so within thirty (30) days of the date of the casualty.

28.4   In the event that the building in which the demised premises is situated be destroyed to the extent of not less than thirty three and one-third percent (33-1/3%) of the replacement cost thereof, Lessor may elect to terminate this lease, whether the demised premises be injured or not, in the same manner as in Section 28.1 above. At all events, a total destruction of the complex of which the leased premises form a part, or the leased premises itself, shall terminate this lease.

CONDEMNATION        29.1   (a)   "Condemnation" means (i) the exercise of any governmental power, whether by legal proceedings or otherwise, by a condemnor and/or (ii) a voluntary sale or transfer by Lessor to any condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

. (b)   "Date of taking" means the date the condemnor has the right to possession of the property being condemned.

(c).   "Award" means all compensation, sums or anything of value awarded, paid, or received on a total or partial condemnation.

· (d)   "Condemnor" means any public or quasi public authority, or private corporation or individual, having the power of condemnation.

29.2   If the premises are totally taken by condemnation, this lease shall terminate on the date of taking.

29.3   (a)   (1)   If any portion of the premises is taken by condemnation, this lease shall remain in effect, except that Lessee can elect to terminate this lease if fifty percent (50%) or more of the total number of square feet in the premises is taken.

(2)   If Lessee elects to terminate this lease, Lessee must exercise its right to terminate pursuant to this paragraph by giving notice to Lessor within thirty (30) days after the nature and the extent of the taking have been finally determined. The date of termination under such circumstances shall be sixty (60) days after Lessee has notified Lessor of its election to terminate; except that this lease shall terminate on the date of taking if the date of taking falls on a date before the date of termination as



specified above. If Lessee does not terminate this lease within the thirty (30) day period, this lease shall continue in full force and effect, except that minimum monthly rent shall be reduced by a fraction, the numerator of which is the number of square feet taken from the leased premises and the denominator of which is the number of square feet in the premises prior to the taking.

(b) (1)   If a portion of the common areas of the Shopping Center of which the premises form a part is taken by condemnation, this lease shall remain in full force and effect, except that if thirty percent (30%) or more of the common area and/or fifty percent (50%) or more of the building or other improvements in which the premises are located are taken by condemnation, either party shall have the election to terminate this lease pursuant to this paragraph.

(2)   If either party elects to terminate this lease, it must terminate pursuant to this paragraph by giving notice to the other party within thirty (30) days after the nature and extent of the taking having been finally determined. The party terminating this lease also shall notify the other party of the date of termination, which date shall not be earlier than sixty (60) days or later than ninety (90) days after the terminating party has notified the other party of its election to terminate; except that this lease shall terminate on the date of taking if the date of taking falls on a date before the date of termination designated in the notice from the terminating party. If this lease is not terminated within the thirty (30) day period, it shall continue in full force and effect.

(c)   If there is a partial taking of the premises and this lease remains in full force and effect pursuant to this Article, Lessor, at its cost, shall accomplish all necessary restoration so that the premises is returned as near as practically possible to its condi-tion immediately prior to the date of the taking, to the extent of funds actually paid to Lessor by the condemnor. Lessor's restoration obligation hereunder is limited to those items in the premises for which it has the obliga-tion to maintain under Article 15 hereof.

29.4   Any award arising from the condemnation or the settle-ment thereof shall belong to and be paid to the Lessor except that the Lessee shall receive from the award the following, if specified in the award by the condemning authority, so long as it does not reduce the Lessor's award in respect of the real property: Lessee's trade fixtures, personal property, goodwill, loss of business and relocation expenses. At all events, the Lessor shall be solely entitled to all award in respect of the real property, including the bonus value of the leasehold. The Lessee shall not be entitled to any award until the Lessor has received the above sum in full.

[Except as provided in attached rider.

ASSIGNMENT   30.1   Lessee shall not assign this lease, or any interest therein,
AND   and shall not sublet the said premises or any part thereof, or any
SUBLETTING   right or privilege appurtenant thereto, or suffer any other person (the agents and servants of Lessee excepted) to occupy or use the said premises, or any portion thereof, without the written consent of Lessor first had and obtained, and a consent to one assignment, subletting, occupation or use by any other person, shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Any such assignment or sub-letting without such consent shall be void, and shall, at the option of Lessor, terminate this lease. This lease shall not, nor shall any interest therein, be assignable, as to the interest of Lessee, by operation of law, without the written consent of Lessor.

[Except as provided in attached rider.

30.2   The consent of the Lessor required under Section 30.1 above, may not be unreasonably withheld, provided, should Lessor

- 15 -



withhold its consent for any of the following reasons, which list is not exclusive, such withholding shall be deemed to be reasonable:

(a)    A conflict with other uses in the Shopping Center of which the premises form a part;

(b)    Incompatibility of the proposed use with others within the Shopping Center of which the premises form a part;

(c)    Financial inadequacy of the proposed sublessee or assignee;

(d)    A proposed use or user which would cause a diminution in the reputation of the Shopping Center or the other businesses located therein;

(e)    Wherein the percentage rent clause herein is not suitable for the proposed new assignee or sublessee in that their volume could reasonably be expected to be less than that of the Lessee hereunder;

(f).    A proposed user whose impact on the common facilities or the other tenants in the Shopping Center would be disadvantageous.

In any event, should the Lessor decline to give its consent for any reason other than those designated above, Lessor may do so, in which event this lease shall terminate thirty (30) days following written notice from Lessor to Lessee of such withholding of consent. At that time, all obligations of both parties hereunder shall terminate.

30.3    Notwithstanding the foregoing, [Except as provided in attached rider.] the following conditions shall apply to any proposed assignment or sublease hereunder:

(a)    Each and every covenant, condition, or obligation imposed upon Lessee by this lease and each and every right, remedy, or benefit afforded Lessor by this lease shall not be impaired or diminished as a result of such assignment or sublease;

(b)    Lessee shall assign to Lessor any and all consideration paid directly or indirectly for the assignment by Lessee to the assignee of Lessee's leasehold interest or any and all sub-rentals payable by sublessees which are in excess of the minimum guaranteed monthly rental provided herein (computed on a square footage basis).

(c)    If Lessee is a corporation which is not deemed a public corporation, or is an unincorporated association or partnership, the transfer, assignment or hypothecation of any stock or interest in such corporation, association or partnership in the aggregate in excess of twenty-five percent (25%) shall be deemed an assignment within this Article 30;

(d)    Lessee shall reimburse Lessor as additional rent for Lessor's reasonable costs and attorney's fees incurred in conjunction with the processing and documentation of any such requested assignment, subletting, transfer, change of ownership or hypothecation of this lease or Lessee's interst in and to the premises;

(e)    Lessor may condition the approval of any assignment or subletting as specified herein upon an increase in the minimum guaranteed rental payable by Lessee or Lessee's successor in interest;

- 16 -



(1)    No subletting or assignment, even with the consent of Lessor, shall relieve Lessee of its obligation to pay the rent and to perform all othe obligations to be performed by Lessee hereunder. The acceptance of rent by Lessor from any person shall not be deemed to be a waiver by Lessor of any provision of this lease or to be a consent to any assignment or subletting.

[Except as provided in attached rider.]

30.4    Notwithstanding anything to the contrary contained herein, at Lessor's election:

(a)    In the event that at any time or from time to time during the term of this lease, Lessee desires to assign or sublet all or part of the demised premises, Lessee shall notify the Lessor in writing (hereinafter referred to as "Transfer Notice") of the terms of the proposed assignment or subletting, the proposed transferee and the area so proposed to be assigned or sublet and shall give the Lessor the right to accept an assignment or to sublet from Lessee such space (hereinafter referred to as "Transferred Space") on the same terms as those contained in this lease, including the rent which Lessee is then paying for such space, calculated on the basis of the total minimum rent hereunder divided by the total square footage in the entire premises multiplied by the number of square feet to be assigned or sublet. Such option shall be exercisable by Lessor in writing for a period of thirty (30) days after receipt of the Transfer Notice.

(b)    If Lessor fails to exercise such option, and Lessee fails to complete negotiations for a valid and bona fide assignment to or sublease with a third party within sixty (60) days thereafter in accordance with the terms of the Transfer Notice, Lessee shall again comply with all the conditions of this Article 30, as if the notice and option hereinabove referred to had not been given and received.

(c)    In the event Lessor does not exercise its option and Lessee completes negotiations for an assignment or sublease with a third party within the sixty (60) day period, Lessee shall deliver an executed copy of such assignment or sublease to Lessor to obtain its consent as required in this Article 30. If the Lessor consents to a sublease, then such sublease shall be subject to and made upon the following terms:

1.    Any such sublease shall be subject to the terms of this lease and the term thereof may not extend beyond the expiration of the term of this lease;

2.    The use to be made of the Transferred Space shall be a legal use in keeping with the character of the complex and the terms of this lease;

3.    Such assignment or sublease shall not violate any negative covenant as to use contained in any deed of trust affecting the complex; and

4.    No sublessee shall have a right to further sublet.

(d)    Lessee shall have the right without the consent of Lessor but upon prior written notice to Lessor, to assign this lease to a company incorporated or to be incorporated by Lessee provided that Lessee owns or beneficially controls all the issued and outstanding shares in the capital stock of the company. Such assignment shall not, however, relieve Lessee from its obligations for the payment of rent and for the full and faithful observance and performance of the covenants, terms and conditions contained herein.

- 17 -



(e)    No permitted assignment or sublease shall be valid and no assignee or sublessee shall take possession of the premises assigned or sublet unless, within ten (10) days after the execution thereof, Lessee shall deliver to Lessor a duly executed duplicate original of such assignment or sublease in form satisfactory to Lessor which provides (1) the assignee or sublessee assumes Lessee's obligations for the payment of rent and for the full and faithful observance and performance of the covenants, terms and conditions contained herein, an (2) that such assignee or sublessee will, at Lessor's election, attorn directly to Lessor in the event Lessee's lease is terminated for any reason, and (3) such assignment or sublease contains such other assurances as Lessor reasonably deems necessary.

**COVENANT NOT TO COMPETE**    31.    ~~Lessee, or any individual, firm, or corporation that con~~trols Lessee or is controlled by Lessee, shall not own, operate, or become financially interested in a business similar to the one conducted on the premises, within three miles in any direction from the premises, the mileage to be measured on a straight line basis on a map, not following contours of the land and streets. If Lessee defaults in performance under this paragraph, Lessor can elect to include the gross sales from such other business in the gross sales made from or upon the premises for the purpose of computing percentage rent payable under this lease, or may elect any of the other remedies available for default hereunder, such election being cumulative; any or all or any combination of such remedies being ~~available to the Lessor at its option.~~

**ABANDONMENT**    32.    Lessee shall not vacate or abandon the premises at any time during the term; and if Lessee shall abandon, vacate or surrender the premises, or be dispossesed by process of law, or otherwise, any personal property belonging to Lessee and left on the premises shall be deemed to be abandoned, at the option of Lessor, except such property as may be mortgaged to Lessor.

**DEFAULT**    33.1    The occurrence of any of the following shall constitute a material default and breach of this lease by Lessee:

(a)    Any failure by Lessee to pay the rental or to make any other payment required to be made by Lessee hereunder when due.

(b)    The abandonment or vacation of the premises by Lessee in violation of Article 32 hereof.

(c)    A failure by Lessee to observe and perform any other provision of this lease to be observed or performed by Lessee, where such failure continues for twenty (20) days after written notice thereof by Lessor to Lessee; provided, however, that if the nature of such default is such that the same cannot reasonably be cured within such twenty (20) day period, Lessee shall not be deemed to be in default if Lessee within such period commence such cure and thereafter diligently prosecute the same to completion.

(d)    Either (1) the appointment of a receiver (except a receiver appointed at the instance or request of Lessor) to take possession of the premises or of any of the assets of Lessee, or (2) a general assigment by Lessee for the benefit of creditors, or (3) any action taken or suffered by Lessee under any insolvency or bankruptcy act shall constitute a breach of this leaseby Lessee. In such event, Lessor may, at his option, declare this lease terminated and forfeited by Lessee, and Lessor shall be entitled to immediate possession of such premises.

(e)    Any two (2) failures by Lessee to observe and perform any provision of this lease during any twelve (12) month

\* Landlord acknowledges that Tenant shall have the right to close the business temporarily in order to retake the premises from its franchisee.  Tenant shall not close for more than thirty (30) days.



period of the term, as such may be extended, shall constitute, at the option of the Lessor, a separate non-curable default.

**REMEDIES UPON DEFAULT**

34.1    Lessor and Lessee agree as follows upon Lessor's remedies for any default by Lessee as set forth in Section 33.1 above:

(a)    In the event of any such default by Lessee, then in addition to any other remedies available to Lessor at law or in equity, Lessor shall have the immediate option to terminate this lease and all rights of Lessee hereunder by giving written notice of such intention to terminate. In the event that Lessor shall elect to so terminate this lease, then Lessor may recover from Lessee:

(i)    the worth at the time of award of any unpaid rent which had been earned at the time of such termination; plus

(ii)    the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss Lessee proves could have been reasonably avoided; plus

(iii)    the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that Lessee proves could have been reasonably avoided; plus    See Attached Rider to Lease .

(iv)    any other amount necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform his obligations under this lease or which in the ordinary course of things would be likely to result therefrom; and

(v)    at Lessor's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by the law applicable in the State in which the Shopping Center is located.  See attached Rider to Lease.

(b)    The term "rent", as used herein, shall be deemed to be and to mean set minimum rental and all other sums required to be paid by Lessee pursuant to the terms of this lease.

(c)    As used in subparagraphs (a)(i) and (ii) above, the "worth at the time of award" is computed by allowing interest at the rate of ten percent (10%) per annum. As used in subparagraph (a)(iii) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

(d)    In the event of any such default by Lessee, Lessor shall also have the right, with or without terminating this lease, to re-enter the premises and remove all persons and property from the premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Lessee.

(e)    In the event of the vacation or abandonment of the premises by Lessee or in the event that Lessor shall elect to re-enter as provided in subparagraph (d) above, or shall take possession of the premises pursuant to legal proceeding or pursuant to any notice provided by law, then if Lessor does not elect to terminate this lease as provided in subparagraph (a) above, Lessor may from time to time, without terminating this lease, either recover all rental as it becomes due or relet the premises or any part thereof for such term or terms and at such rental or rentals and upon such other terms and conditions as Lessor in its sole discretion, may deem advisable with the right to make alterations and repairs to the premises.

- 19 -



(f)    In the event that Lessor shall elect to so relet, then rentals received by Lessor from such reletting shall be applied: first, to the payment of any indebtedness other than rent due hereunder from Lessee to Lessor; second, to the payment of any cost of such reletting; third, to the payment of the cost of any alterations and repairs to the premises; fourth, to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Lessor and applied in payment of future rent as the same may become due and payable hereunder. Should that portion of such rentals received from such reletting during any month, which is applied by the payment of rent hereunder, be less than the rent payable during that month by Lessee hereunder, then Lessee shall pay such deficiency to Lessor immediately upon demand therefore by Lessor. Such deficiency shall be calculated and paid monthly. Lessee shall also pay to Lessor as soon as ascertained, any costs and expenses incurred by Lessor in such reletting or in making such alterations and repairs not covered by the rentals received from such reletting.

(g)    No re-entry or taking possession of the premises or any other action under this paragraph shall be construed as an election to terminate this lease unless a written notice of such intention be given to Lessee or unless the termination thereof be decreed by a Court of competent jurisdiction. Notwithstanding any reletting without termination by Lessor because of any default by Lessee, Lessor may at any time after such reletting elect to terminate this lease for any such default.

**FORFEITURE OF PROPERTY AND LANDLORD'S LIEN**

35.1    Lessee agrees that as of the date of termination of this lease or repossession of the premises by Lessor, by way of default or otherwise, it shall remove all personal property to which it has the right to ownership pursuant to the terms of this lease. Any and all such property of Lessee not removed by such date shall, at the option of Lessor, irrevocably become the sole property of Lessor. Lessee waives all rights to notice and all common law and statutory claims and causes of action which it may have against Lessor subsequent to such date as regards the storage, destruction, damage, loss of use and ownership of the personal property affected by the terms of this Article. Lessee acknowledges Lessor's need to relet the premises upon termination of this lease or repossession of the premises and understands that the forfeitures and waivers provided herein are necessary to aid said reletting.

~~35.2    Lessee hereby grants Lessor a lien upon and security interest in all fixtures, chattels and personal property of every kind, now or hereafter, placed or in storage in or on the premises and agrees that in the event of any default on the part of Lessee, Lessor shall have all the rights and remedies afforded to the secured party by Article 9 of the Uniform Commercial Code of Nevada, on the date of this Lease and may, in connection therewith, also (a) enter the premises to assemble, take possession of the collateral; (b) require Lessee to assemble the collateral and make its possession available to the Lessor at the premises; (c) enter the premises, render the collateral, if equipment, unusable and dispose of it in the manner provided for by the Uniform Commercial Code of Nevada on Lessee's premises. Lessee designates Lessor his attorney-in-fact for purposes of executing such documents as may be necessary to perfect the lien and security interest granted hereunder.~~

**SURRENDER OF LEASE**

36.    The voluntary or other surrender of this lease by Lessee, or a mutual cancellation thereof, shall not work as a merger, and shall, at the option of Lessor, terminate all or any existing subleases or subtenancies, or may, at the option of Lessor, operate as an assignment to him of any or all such subleases or subtenancies.

- 20 -



SUBORDINATION

37.   This lease shall, at the option of the mortgagee, or beneficiary be subordinate to any mortgage or Deed of trust which shall at any time be placed upon the demised premises or any part thereof or the building of which the demised premises are a portion, and Lessee agrees to execute and deliver *any instrument without cost, which may be deemed necessary to further effect the subordination of this lease to any such mortgage or Deed of Trust, provided, however, that the mortgagee agrees that in the event of transfer of title to the demised premises by Lessor to a mortgagee, trustee or beneficiary under said Deed of Trust or to any purchaser therefrom or successor thereto, this lease shall not terminate if Lessee is not in default. Lessee shall attorn to said new owner as if a party hereto regardless of any rule of law to the contrary or absence of privity of contract. * within ten (10) days of Tenant's receipt of written notice. .

EMPLOYEE PARKING

38.   Automobiles of Lessee, its employees and agents shall not park within the parking area except in areas delineated by Lessor as "employee parking."

NOTICES

39.1   All notices to be given to either party hereunder may be given in writing, personally or by depositing the same in the United States mail, postage prepaid, certified mail, return receipt requested, at the addresses for the parties as specified in Section 1.2 hereof.

39.2   Either party may change the address to which notices are required to be given by written notice to the other party. All notices shall be deemed effective upon receipt if personally delivered, or upon execution of the return receipt if by United States mail.

TRANSFER OF SECURITY

40.   If any security be given by Lessee to secure the faithful performance of all or any of the covenants of this lease on the part of Lessee, Lessor may transfer and/or deliver the security, as such, to the purchaser of the reversion, in the event that the reversion be sold, and thereupon Lessor shall be discharged from any further liability in reference thereto.

WAIVER

41.   The waiver by Lessor of any breach of any lease provision shall not be deemed to be a waiver of such lease provision or any subsequent breach of the same or any other term, covenant or condition therein contained. The subsequent acceptance of rent hereunder by Lessor shall not be deemed to be a waiver of any preceding breach by Lessee of any provision of this lease, other than the failure of Lessee to pay the particular rental so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

HOLDING OVER

42.   Any holding over after the expiration of the term hereof, with the consent of the Lessor, shall be construed to be a tenancy from month to month upon the same terms and conditions as existed during the last month of the term hereof, ~~so far as applicable, except that the minimum rental shall be twice the minimum rental in effect immediately prior to the expiration or sooner termination of the lease.~~

LIMITATION ON LESSOR'S LIABILITY

43.   If Lessor is in default of this lease, and as a consequence Lessee recovers a money judgment against Lessor, the judgment shall be satisfied only out of the proceeds of sale received on execution of the judgment and levy against the right, title, and interest of the Lessor in the premises or the shopping center of which the premises forms a part. Neither the Lessor nor any of the partners; officers, directors, employees, or representatives of the Lessor designated as Lessor, shall be personally liable for any deficiency.

- 21 -



LATE CHARGES

44.    Lessee acknowledges that late payment by Lessee to Lessor of rent or any other payment due hereunder will cause Lessor to incur costs not contemplated by this lease, the exact amount of such costs being extremely difficult and impractical to fix. Such costs include, without limitation, processing and accounting charges, and late charges that may be imposed on Lessor by the terms of any encumbrance and note secured by any encumbrance covering the premises. Therefore, if any installment of rent, or any other payment due hereunder, due from Lessee is not received by Lessor when due, Lessee shall pay to Lessor an additional sum of ten percent (10%)*of such rent or other charge as a late charge. The parties agree that this late charge represents a fair and reasonable estimate of the cost that Lessor will incur by reason of late payment by Lessee. Acceptance of any late charge shall not constitute a waiver of Lessee default with respect to the overdue amount, or prevent Lessor from exercising any other rights or remedies available to Lessor.

* or the maximum legal rate, whichever is less.

SUCCESSORS AND ASSIGNS

45.    The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

TIME

46.    Time is of the essence of this lease with respect to each and every article, section and subsection hereof.

MARGINAL CAPTIONS

47.    The captions in the margins of this lease are for convenience only and are not a part of this lease and do not in any way, limit or amplify the terms and provisions of this lease.

EFFECT OF LANDLORD'S CONVEYANCE

48.    If during the term of this lease, Lessor shall sell his interest in the Shopping Center, or the premises, then from and after the effective date of sale, Lessor shall be released and discharged from any and all obligations and responsibilities under this lease except those already accrued.Provided the transferee expressly assumes the obligations of this lease.   Tenant has the right to record lease.

DEFAULT OF LESSOR

49.    If Lessor is in default of this lease, and as a consequence Lessee recovers a money judgment against Lessor, the judgment shall be satisfied only out of the proceeds of sale received on execution of the judgment and levy against the right, title, and interest of the landlord in the Shopping Center, and out of the rent or other income from such real property receivable by the Lessor or out of the consideration received by Lessor from the sale or other disposition of all or any part of Lessor's right, title and interest in the Shopping Center. Neither the Lessor nor any of the partners comprising the partnership designated as Lessor (if applicable) shall be personally liable for any deficiency.

OFFSET STATEMENTS

50.    Within ten (10) days of request therefor by Lessor, Lessee shall provide a written statement acknowledging the commencement and termination dates of this lease, that it is in full force and effect, has not been modified (or if it has, stating such modifications), and providing any other pertinent information as Lessor or its agent might reasonably request. Failure to comply with this paragraph shall be a material breach of this lease by Lessee giving Lessor all rights and remedies of Article 34. hereof, as well as a right to damages caused by the loss of a loan or sale which may result from such failure by Lessee.

ATTORNEY'S FEES

51.    If either party becomes a party to any litigation concerning this lease, the premises, or the building or other improvements of which the premises form a part, by reason of any act or omission of the other party or its authorized representatives, and not by any act or omission of the party that becomes a party to that

- 22 -



litigation or any act or omission of its authorized representatives, the party that causes the other party to become involved in the litigation shall be liable to that party for reasonable attorney's fees, court costs, investigation expenses, discovery costs and costs of appeal incurred by it in the litigation.

    If either party commences an action against the other party arising out of or in connection with this lease, the prevailing party shall be entitled to have and recover from the losing party reasonable attorney's fees, costs of suit, investigation costs and discovery costs, including costs of appeal.

**WAIVER OF CERTAIN PROVISIONS**

52.    Lessee waives any and all statutory or common law rights now or hereinafter in effect with respect to the destruction of the premises, and any rights accruing to Lessee as a result thereof, Lessor's repair duties and Lessee's right to repair and deduct the amount of such repairs from rental, and any provision allowing either party to petition to terminate this Lease in the event of a partial taking of the premises by condemnation as defined herein.

**LESSEE'S COVENANTS**

53.    As additional consideration, which additional consideration induces Lessor to execute this lease, Lessee covenants as follows:

    (a)    Lessee's Opening. The Lessee will open for business on the commencement date. In that event that, for any reason not attributable to the Lessor, the Lessee does not open to the public for business on the commencement date the Lessee agrees that, without prejudice to any other remedy the Lessor may have, the Lessee shall pay to the Lessor as additional rental and as liquidated damages and not as a penalty an amount equal to twice the minimum rental provided to be paid under the terms of this lease. except for the period from the commencement date to the date that Lessee actually opens to the public for business.

    (b)    Floor Load. Lessee shall not place a load upon any floor of the leased premises which exceeds one hundred (100) pounds per square foot. Lessor reserves the right to prescribe the weight, movement and position of all safes and heavy installations which the Lessee wishes to place in the leased premises so as to properly distribute the weight thereof.

    (c)    Garbage, Debris, and Refuse. The Lessee shall not place or leave or permit to be placed or left in or upon any part of the common areas any garbage, debris or refuse. Lessee shall deposit all refuse and debris in an area to be designated by Lessor for such purpose. The Lessee shall pay the cost of any garbage and refuse removal on the basis of the volume of such refuse as reasonably determined by Lessor.

    (d)    Storage - Delivery of Merchandise. All delivery and dispatch of merchandise, supplies, fixtures, equipment and furniture shall be made and shall be conveyed to or from the leased premises by means and during hours established by the Lessor under the Rules and Regulations. The Lessor shall have no responsibility regarding such delivery or dispatch of merchandise, supplies, fixtures, equipment and furniture. The Lessee shall not at any time park its trucks or other delivery vehicles in common areas except in such parts thereof as may be specifically allocated for such purpose.

    (e)    Modifications Required by Lender. It is understood by Lessee that during the term of this lease, Lessor may place new or additional financing upon the Shopping Complex and in that event this lease must be approved by the financing institution making such



~~loans. Accordingly, if any such financial institution requires, as a~~
condition to the making of its loan, any non-substantive modification
of this lease, Lessee agrees to enter into an agreement so modifying
this lease. In the event Lessee refuses on the grounds that the
modification is substantive, that issue only shall be arbitrated as
follows. If the parties are unable to agree on the terms of the
amendment, then each party, at its own cost and expense, and by
giving notice to the other party in writing, shall appoint an arbitrator
with at least five (5) years experience with industrial real property
leases as an appraiser or Real Estate Broker in the County in which
the premises are located (hereinafter "qualified arbitrator"), to
arbitrate and set the terms of the amendment. If a party does not
appoint a qualified arbitrator within ten (10) days after the other
party has given notice of the name of its arbitrator, the single
arbitrator appointed shall be the sole arbitrator and shall set the
terms of the amendment. If the two (2) arbitrators are appointed by
the parties as stated in this section, they shall meet promptly to
select a third qualified arbitrator within ten (10) days after the
appointment of the last of the two arbitrators. If they are unable to
timely agree on the third arbitrator, either of the parties to this
lease, by giving five (5) days notice to the other party, may apply to
the then president of the County Real Estate Board for the county in
which the property is located, or to the presiding judge of the highest
trial court in the county in which the property is located, for the
selection of a third arbitrator. Each of the parties shall bear one-half
of the cost of appointing the third arbitrator and of paying the third
arbitrator's fee. The third arbitrator, however selected, shall be a
person who has not previously acted in any capacity for either party.
Within thirty (30) days after the selection of the third arbitrator,
each of the arbitrators shall notify each of the parties hereto, in
writing, of its opinion as to the terms of the amendment. If it is
determined by such arbitration that Lessee is required to enter into
such amendment and if Lessee refuses to execute such amendment
within ten (10) days after such determination, then Lessor shall have
the right, in addition to any other remedies it may have at law or in
equity by giving written notice to Lessee, to terminate this lease;
and upon giving such notice this lease shall terminate and both Lessor
and Lessee shall pay any sums owing to the other at the time of such
termination.

(f)    Lessor's Right to Cure Default. All covenants and
agreements to be performed by the Lessee under any of the terms of
this lease shall be at its sole cost and expense and without any
abatement of rent. If the Lessee shall fail to pay any sum of money,
other than rent, required to be paid by it hereunder or shall fail to
perform any other act on its part to be performed hereunder and such
failure shall have become an event of default as provided herein, the
Lessor may, but shall not be obligated to do so, and without waiving
or releasing the Lessee from any such obligation, make such payment
or perform any such other act on the Lessee's part to be made or
performed as provided herein. All sums so paid by the Lessor and all
necessary incidental costs shall be deemed additional rent hereunder
and shall be payable to the Lessor immediately.

NO PARTNERSHIP    54.    It is understood and agreed that nothing contained in this
lease nor in any act of the parties hereto shall be deemed to create
any relationship between the parties hereto other than the rela-
tionship of Lessor and Lessee.

BANKRUPTCY    55.    If at any time during the term of this lease there shall be
filed by or against Lessee in any court pursuant to any statute either
of the United States or of any State a petition in bankruptcy or
insolvency or for reorganization or for the appointment of a receiver
or trustee of all or a portion of Lessee's property, or if Lessee makes

- 24 -



an assignment for the benefit of creditors or petitions for, or enters into, an arrangement (any of which are referred to herein as "a bankruptcy event"), then the following provisions shall apply:

(a)    At all events any receiver or trustee in bankruptcy shall either expressly assume or reject this lease within forty-five (45) days following the entry of an "Order for Relief."

(b)    In the event of an assumption of the lease by a debtor or by a trustee, such debtor or trustee shall within fifteen (15) days after such assumption (1) cure any default or provide adequate assurances that defaults will be promptly cured; and (2) compensate Lessor for actual pecuniary loss or provide adequate assurances that compensation will be made for actual pecuniary loss; and (3) provide adequate assurance of future performance.

(c)    Where a default exists in the lease, the trustee or debtor assuming the lease may not require Lessor to provide services or supplies incidental to the lease before its assumption by such trustee or debtor, unless Lessor is compensated under the terms of the lease for such services and supplies provided before the assumption of such lease.

(d)    The debtor or trustee may only assign this lease if: (1) it is assumed; and (2) adequate assurance of future performance by the assignee is provided, whether or not there has been a default under the lease. Any consideration paid by any assignee in excess of the rental reserved in the lease shall be the sole property of, and paid to, Lessor.

(e)    The Lessor shall be entitled to the fair market value for the premises and the services provided by Lessor (but in no event less than the rental reserved in the lease) subsequent to the commencement of a bankruptcy event.

(f)    Lessor specifically reserves any and all remedies available to Lessor in Article 34 hereof or at law or in equity in respect of a bankruptcy event by Lessee to the extent such remedies are permitted by law.

MISCELLANEOUS
PROVISIONS

56.1    Whenever the singular number is used in this lease and when required by the context, the same shall include the plural, the plural shall include the singular, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include corporation, firm or association. If there be more than one lessee, the obligations imposed under this lease upon Lessee shall be joint and several.

56.2    This instrument contains all of the agreements, conditions and representations made between the parties to this lease and may not be modified orally in any other manner than by an agreement in writing signed by all of the parties to this lease.

56.3    Except as otherwise expressly stated, each payment required to be made by Lessee shall be in addition to and not in substitution for other payments to be made by Lessee.

56.4    The validity of any provision of this lease, as determined by a Court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.



IN WITNESS WHEREOF, Lessor and Lessee have executed this lease
this _____ 26 _____ day of _____ September _____, 19 90 .

LESSOR:                                    LESSEE:

BAY 511 CORPORATION                        SUBWAY REAL ESTATE CORP.

By: _____               By: _____
a Agent for Bay 511 Corporation
Title: _____ Vice President _____          Title: VICE PRESIDENT

By: _____               By: ___ 9/17/90 _____

Title: Vice President By 511               Title: _____

–26–

ADDENDUM B

Extension of Term:

(1)    Provided that Tenant shall have fulfilled completely and timely the terms and conditions of this Lease, Tenant shall have the right to extend the term of this Lease for two (2) additional five (5) year period (s) under the same terms and conditions as the original Leases.

(2)    During the first (1st) five (5) year option period (s), the monthly minimum fixed rental payable for the first year of the five year option period (s) shall be Five (5%) per cent greater than the minimum rental at the end of the initial term.    After the rental for the first year of the five year option period (s) is established, the rental shall be increased at the beginning of the thirteenth (13) month of the option Term and annually thereafter.    The formula for increasing the rent annually shall be determined in accordance with the C.P.I. capped at four (4%) percent. During the second five (5) year option period the rent shall be increased annually in accordance with the C.P.I. capped at four percent (4%).

(3)    In order to exercise such option (s) to renew or extend this Lease, Tenant shall give to Owner notice, In writing, of his Intention to do so at least one hundred eighty (180) days prior to expiration of this Lease, and if Tenant shall fail to give such notice within said time limit, all rights and privileges as granted to Tenant to renew or extend this Lease shall thereupon be null and void.

EXHIBIT A

The SmithRidge Plaza Shopping Center is described as:

All of that real property in the County of Washoe, State of Nevada, located within a portion of the SW 1/4 of Section 30, T. 19 N., R. 20 E., M.D.B. & M., and which is more particularly described as follows:

Commencing at a 1 inch galvanized pipe being the corner common to Sections 29, 30, 31 and 32, as shown on Record of Survey #863, recorded on July 12, 1974, in the Office of the County Recorder of Washoe County, Nevada; thence N. 89°49'00" W. 3414.15 feet along the north section line common to Sections 30 and 31 to a point on the south right-of-way line of McCarran Boulevard; thence N. 14°48'53" W. 129.41 feet to the true point of beginning, said point being on the north right-of-way line of McCarran Boulevard; thence from said true point of beginning N. 89°49'00" W. 830.78 feet; thence along a curve to the right whose back tangent bears the last described course, having a central angle of 90°00'00", a radius of 30.00 feet an arc length of 47.12 feet to a tangent line; thence N. 0°11'00" E. 44.62 feet; thence along a curve to the left whose back tangent bears the last described course, having a central angle of 35°45'37", a radius of 230.00 feet and an arc length of 143.55 feet to a tangent line; thence N. 35°34'37" W. 425.41 feet; thence N. 45°09'24" E. 290.11 feet; thence N. 0°09'24" E. 75.00 feet; thence S. 89°50'36" E. 207.02 feet; thence S. 89°50'45" E. 8.98 feet; thence S. 0°09'15" W. 18.00 feet; thence S. 89°50'45" E. 112.48 feet; thence S. 0°10'37" W. 72.98 feet; thence 89°50'55" E. 419.92 feet; thence S. 14°49'00" E. 770.13 feet to the true point of beginning. Said described parcel containing an area of 15.86 acres.

Lessor reserves the right also to eliminate or change any or all or in part the structures and/or common areas and/or land areas shown on the plan. This plan is subject to change and modifications as may be made by LESSOR or as required by any governmental authority having jurisdiction. All measures and distances are approximate. LESSOR does not covenant or represent that any occupancy indicated hereon is or will remain a tenant in either the space marked or in any other space in the shopping center and nothing set forth on this plan is a representation, agreement, or easement right except as specifically set forth in the lease.



CONSUMERS
D
8285 sf

LONGS
F
25,199 sf

ALBERTSONS
G
32,589 sf

H
6,975 sf

C
12,400 sf

I
11,160 sf

ROSS
B
20,111 sf

bank
K
4,000 sf

restaurant
I
8,000 sf

M

south mc. carran blvd.

smithridge drive

summary: 15.85 ac.
site area: 690,426 s.f.
total G.L.A. 169,127 s.f.
parking 908± cars

leasing plan
smithridge plaza    7-11-83

smithridge drive &
so. mc carran blvd. reno, nevada

EXHIBIT B



EXHIBIT "B"

**KRAGEN** 4800 SF

5067

L-1 1540 SF 5065
L-2 1540 SF 5063
L-3 1900 SF 5061
L-4 1400 SF 5059
C-1 1400 SF 5057
C-2 1400 SF 5055
C-3 1700 SF 5053
C-4 1500 SF 5051
C-5 1200 SF 5049
C-6 900 SF 5047
C-7 900 SF 5045
C-8 1200 SF 5043
C-9 900 SF 5041
C-10 1500 SF 5039

CONSUMERS DIST.

5033 - 5037

bldg. L   11,180 SF

bldg. C   12,600 SF

H-1 1087.5 SF 5015
H-2 800 SF 5013
H-3 600 SF 5011
H-4 600 SF 5009
H-5 600 SF 5007
H-6 900 SF 5005
H-7 800 SF 5003
H-8 1087.5 SF 5001

bldg. E   5400 SF

E-1 900 SF 5031
E-2 1500 SF 5029
E-3 1200 SF 5027
E-5 900 SF 5023
E-6 900 SF 5021

bldg. H   6375 SF

bldg. F
LONGS   5019

bldg. G
ALBERTSONS   5017

**SMITHRIDGE PLAZA**
**SO. VIRGINIA & SO. MC CARRAN - RENO**

LEASING PLAN

N



ROSS
30,111 s f

BLDG-M
20,978 s f

scale 1 = 50'
7—11—83

SMITHRIDGE  PLAZA
SMITHRIDGE  DRIVE & SO. MC CARRAN  -  RENO, NEVADA

leasing plan

EXHIBIT C

CONSTRUCTION EXHIBIT - PLANS

A.  Lessor shall construct, furnish or install the following work
(hereinafter referred to as "Lessor's work") within the premises at its expense
and in accordance with building standard design and specifications, subject to
any limitations imposed by applicable regulations relating to the conservation
of energy or other matters adopted by any governmental agency:

1.  <u>Electrical Service Panel</u>:  120-220V, four-wire 100 AMP Service
and a 12 circuit breaker sub panel.

2.  <u>Electrical Outlets</u>:  110 V Double receptacle outlet every 15 lineal
feet on any three (3) walls.

3.  <u>Restrooms</u>:  One (1) located at rear wall in area designated by
Lessor, to be provided with one (1) toilet, one (1) lavatory, exhaust fan, one
(1) standard light fixture, one (1) light switch, one (1) electric double wall
receptacle and rough-in for plumbing for (1) 15-gallon (maximum) hot water
heater.  (Hot water heater not provided by Lessor.)  Walls in restroom painted.

4.  <u>Ceiling</u>:  Finished ceiling in restroom, suspended acoustical tile
T-bar ceiling in sales area only.  (Ceiling height to be determined by Lessor.)

5.  <u>Floors</u>:  Concrete floor throughout (4" thick).  Sheet vinyl floor
with coved base in restroom.  Other finish floor to be by Lessee.

6.  <u>Interior Perimeter Walls</u>:  Firetaped walls.

7.  <u>Lighting</u>:    Recessed  fluorescent switched light fixtures with
no lamps.  Fixtures to be 8 feet on center or as designed by Lessor.

8.  <u>Exterior Sign Outlet</u>:  One (1).  Location to be designated by
Lessor.

9.  <u>Telephone</u>:  One telephone conduit located in rear of store unless
otherwise designated by Lessee and approved by Lessor prior to commencement of
construction.

10.  <u>Air Conditioning and Heating</u>:  Refrigerated air conditioning and
heating per Lessor's design.

11.  <u>Store Front</u>:  As per plan.  Door has cylinder lock, keyed both
sides.

12.  <u>Rear Door</u>:  Hollow steel 3' X 7'0" door with keys and lock.  Design
and location as per plan.

Unless otherwise agreed by Lessor and Lessee in writing, all of Lessor's work
shall be completed prior to the commencement of Lessee's work.

- 1 -

EXHIBIT C



B.    Lessee, at its expense, shall construct, furnish or install all improvements, equipment or fixtures within the premises other than Lessor's work described in paragraph 1 above.    Any modifications of Lessor's work requested by Lessee shall be subject to Lessor's approval and shall be at Lessee's expense.  Lessee's work shall be in conformity with plans submitted to and approved by Lessor and shall be performed all in accordance with the following provisions:

1.    At or prior to the execution of this lease by Lessor, Lessor shall furnish to Lessee drawings showing the area of the premises and structural elements and utility facilities in sufficient detail to permit Lessee to prepare plans of Lessor's work.

2.    Lessee shall cause all plans, drawings and specifications for Lessee's work, whether preliminary or final, to be prepared by licensed architects and, where appropriate, mechanical, electrical and structural engineers.

3.    Within thirty (30) days following the date of execution of this lease by Lessor, Lessee shall prepare and submit to Lessor for its approval, as to design, two sets of fully dimensioned scale preliminary drawings of the premises and Lessee's proposed work therein.

4.    Within fourteen (14) days after receipt by Lessee's preliminary drawings Lessor shall return one set of prints thereof with Lessor's approval and/or suggested modifications noted thereon. If Lessor has approved Lessee's preliminary drawings subject to modifications, such modifications shall be deemed to be acceptable to and approved by Lessee unless Lessee shall prepare and resubmit revised drawings for further consideration by Lessor.  If Lessor has suggested modifications without approving Lessee's preliminary drawings Lessee shall prepare and resubmit revised drawings within fourteen (14) days for consideration by Lessor.  All revised drawings shall be submitted to Lessor within fourteen (14) days following Lessor's return to Lessee of the drawings originally submitted, and Lessor shall approve or disapprove such revised plans within seven (7) days following receipt of the same.  In the event that Lessee has failed timely to submit or resubmit preliminary drawings to Lessor, or in the event that Lessor shall disapprove drawings resubmitted by Lessee, Lessor shall have the right to cancel this lease by notice to the Lessee.

5.    Following approval of Lessee's preliminary drawings by Lessor, Lessee shall proceed diligently to prepare final plans and specifications for Lessee's work in conformity with such approved preliminary drawings, and shall furnish two copies of such final plans and specifications to Lessor for its determination as to conformity with approved preliminary drawings and for its approval as to any matters not shown in the approved preliminary drawings.  Lessor shall approve or disapprove such final plans and specifications within seven (7) days following receipt of the same, and in the event of disapproval Lessee shall promptly revise and resubmit such final plans and specifications as required by Lessor.

6.    After approval of final plans and specifications by Lesor, Lessee shall proceed forthwith to commence performance of Lessee's work, provided that Lessee shall adopt a schedule in conformance with the schedule of Lessor's contractors and conduct its work in such a manner as to maintain harmonious labor relations and as not to interfere unreasonably with or delay the work of Lessor's contractors.  Lessee's contractors and subcontractors shall be acceptable to and approved by Lessor and shall be subject to administrative supervision by Lessor in their use of the Shopping Center complex and their relationship with Lessor's contractors or contractors of other tenants in the Shopping Center Complex.  Contractors and subcontractors engaged by Lessee shall employ men and means to insure so far as may be possible to progress of Lessee's work without interruption on account of strikes, work stoppage or similar causes of delay. Lessor shall give access and entry to the premises to Lessee and its contractors and subcontractors and reasonable opportunity and time and reasonable use of facilities to enable Lessee to perform and complete Lessee's work; provided, however, that if such entry is prior to the commencement of the term of this lease such entry shall be subject to all of the terms and conditions of this lease except the payment of rent.  Any damage to the Shopping

- 2 -

EXHIBIT C



Center Complex caused by Lessee or its contractors or subcontractors in connection with the performance of Lessee's work shall be repaired at Lessee's expense. Core drilling in the slab is expressly forbidden.

7. Any changes in Lessee's work from the final plans and specifications approved by Lessor shall be subject to Lessor's approval, and Lessee shall pay all costs incurred by Lessor in reviewing any requested change.

8. Upon completion of Lessee's work Lessee shall furnish to Lessor for its permanent files one reproducible set of "as built" drawings showing Lessee's work as constructed or installed in the premises.

9. No Lessee work shall begin until proper certificates of insurance for Lessee's contractor and subcontractors have been received by the Lessor. Certificates must hold Lessor and its contractor harmless from all acts of Lessee or its agents.

10. Lessee shall not commence any construction or alterations to or upon the premises unless and until Lessee has provided Lessor copies of all governmental permits, including building permits, which may be required for such work. Upon completion of the work Lessee must deliver to Lessor a copy of the Certificate of Occupancy which is required to be issued by the appropriate governmental authority, before Lessee is entitled to open the premises for commencement of business. Failure to do so shall constitute material breach of the Lease.

- 3 -

EXHIBIT C

EXHIBIT D

ACKNOWLEDGEMENT OF COMMENCEMENT

This Acknowledgement is made as of _____, with reference to that certain Lease Agreement (hereinafter referred to as the "lease") dated _____, by and between Bay 511 Corporation, as "Lessor" therein and _____, as "Lessee".

The undersigned, hereby confirms the following:

1.    That the Lessee accepted possession of the Demised Premises (as described in said lease ) on _____, and acknowledges that the premises are as represented by Lessor and in good order, condition and repair; and that the improvements, if any required to be constructed for Lessee by Lessor under this lease have been so constructed and are satisfactorily completed in all respects.

2.    That all conditions of said lease to be performed by Lessor prerequisite to the full effectiveness of said lease have been satisfied and that Lessor has fulfilled all of its duties of an inducement nature.

3.    That in accordance with the provisions of Section 5 of said lease the Commencement Date of the term is _____ and that, unless sooner    terminated,    the    original    term    thereof    expires    on _____.

4.    That said lease is in full force and effect and that the same represents the entire agreement between Lessor and Lessee concerning said lease.

5.    That there are no existing defenses which Lessee has against the enforcement of said lease by Lessor, and no offsets or credits against rentals.

6.    That the minimum rental obligation of said lease is presently in effect and that all rentals, charges and other obligations on the part of Lessee under said lease commenced to accrue on _____.

7.    That the undersigned Lessee has no notice of any prior assignment, hypothecation or pledge of said lease or of the rents thereunder.

| LESSOR: | LESSEE: |
|---|---|
| BAY 511 CORPORATION | SUBWAY REAL ESTATE COPR. |

by _____    by _____
                                       Vice President

EXHIBIT D

EXHIBIT E

SMITHRIDGE PLAZA

[ Provided said rules apply uniformly to all Tenants of the shopping center.
[ Lessee hereby agrees to the establishment of, and shall abide by, the following rules and regulations for the use of the premises and of the roadways, walkways, malls, parking areas and other common facilities which are located in the SmithRidge Plaza Shopping Center, Reno Nevada (the "Shopping Center"):

1.    Lessee shall be open for business during "normal business hours" as from time to time designated by Lessor.  Lessee shall have its window displays, exterior signs and exterior advertising displays adequately illuminated continuously during such hours as may be designated from time to time by lessor.

2.    The sidewalks, halls, passages, exits, entrances, elevators, shopping malls, escalators and stairways of the Shopping Center shall not be obstructed by any of the Lessees or used by them for any purpose other than for ingress to and egress from their respective premises.  The halls, passages, exits, entrances, elevators, shopping malls, escalators and stairways are not for the use of the general public, and Lessor shall in all cases retain the right to control and prevent access thereto of all persons whose presence in the judgment of Lessor shall be prejudicial to the safety, character, reputation and interests of the Shopping Center and its Lessees, provided that nothing herein contained shall be construed to prevent such access to persons with whom any Lessee normally deals in the ordinary course of its business, unless such persons are engaged in illegal activities.  No Lessee and no employee or invitee of any Lessee shall go upon the roof of the Shopping Center.

3.    No awning, canopy or other projection of any kind over or around the windows or entrances of the premises shall be installed by any Lessee without the prior written consent of Lessor, and only such window coverings as are approved by Lessor shall be used in the premises.

4.    The premises shall not be used for lodging, and unless ancillary to a restaurant or other food service use specifically authorized in the lease of a particular Lessee, no cooking shall be done or permitted by any Lessee on the premises, except that the preparation of coffee, tea, hot chocolate and similar items for Lessees and their employees shall be permitted.

5.    Lessor will furnish each Lessee with two keys free of charge.  Lessor may make reasonable charge for any additional keys.  Each Lessee shall in each case furnish lessor with a key for any such lock.  Each Lessee upon the termination of its tenancy, shall deliver  to Lessor all keys to doors in the Shopping Center which shall have been furnished to Lessee.

6.    No Lessee shall use or keep in the premises or the Shopping Center any kerosene, gasoline or inflammable or combustible fluid or material or use any method of heating or air conditioning other than that supplied by Lessor.  No Lessee shall use, keep or permit to be used or kept any foul or noxious gas or substance in the premises, or permit or suffer the premises to be occupied or used in manner offensive or objectionable to Lessor or other occupants of the Shopping Center by reason of noise, odors, and/or vibrations, or interfere in any way with other Lessees or those having business therein.
*Landlord acknowledges that the normal operation of Tenant's business will create the aroma of fresh-baking bread which shall not be considered a violation of this provision.

7.    In the case of invasion, mob, riot, public excitement, or other circumstances rendering such action advisable in Lessor's opinion, Lessor reserves the right to prevent access to the Shopping Center during the continuance of the same by such action as Lessor may deem appropriate, including closing entrances to the Shopping Center.

8.    No Lessee (other than one in the restaurant or other food service business)

- 1 -

EXHIBIT E



shall obtain for use in the premises, ice, drinking water, food, beverage, towel or other similar services, except at reasonable hours and under reasonable regulations fixed by Lessor.

9.    Each Lessee shall see that the doors of its premises are closed and sercurely locked at such time as Lessee's employees leave the premises.

10.    The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Lessee who, or whose employees or invitees, shall have caused it.

11.    Neither sidewalks or walkways nor mall or other areas adjacent to the premises shall be used to display, store, or place any merchandise, equipment, or devices.

12.    No Lessee shall install any radio or television antenna, loudspeaker, or other device on the roof or exterior walls of the Shopping Center.

13.    No advertising medium shall be utilized which can be heard or experienced outside of Lessee's premises including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television.

14.    No use shall be made of the premises which would (a) violate any law, ordinance or regulation, (b) constitute a nuisance, (c) constitute an extrahazardous use, or (d) violate, suspend or void any policy or policies of insurance on the buildings in the Shopping Center.

15.    There shall not be used in any space, or in the public halls or malls of the Shopping Center, either by any Lessee or others, any handtrucks except those equipped with rubber tires and side guards or such other material handling equipment as Lessor may approve.  No other vehicles of any kind shall be brought by any Lessee into the Shopping Center or kept in or about its premises.

16.    Each Lessee shall store all its trash and garbage within its premises until removal of the same to such location in the Shopping Center as may be designated from time to time by Lessor.  No material shall be placed in the Shopping Center trash boxes or receptacles if such material is of such nature that it may not be disposed of in the orginary and customary manner of removing and disposing of trash and garbage in the City of Reno without being in violation of any law or ordinance governing such disposal.

17.    All loading and unloading of merchandise, supplies, materials, garbage and refuse shall be made only through such entryways and elevators and at such times as Lessor shall designate.  In its use of the loading areas, the Lessee shall not unreasonable obstruct or permit the unreasonable obstruction of said loading areas and at no time shall park or allow its officers, agents or employees to park vehicles therein except for loading and unloading.

18.    Canvassing, soliciting, peddling and distribution of hand bills or any other written material in the Shopping Center are prohibited and each Lessee shall cooperate to prevent the same.

19.    No person shall use any Automobile Parking Areas except for the parking of motor vehicles during the period of time such person or the occupants of such vehicle are customers or business invitees of the retail establishments within the Shopping Center.  All motor vehicles shall be parked in an orderly manner within the painted lines defining the individual parking places.  During peak periods of business activity, limitations may be imposed as to the length of time for parking use.  Such limitations may be made in specified areas.  Lessor reserves the right to designate special areas for employee parking.

20.    Lessor may waive any one or more of these Rules and Regulations for the benefit of any particular Lessor or Lessees, but no such waiver by Lessor shall be

- 2 -

EXHIBIT E



construed as a waiver of such Rules and Regulations in favor of any other Lessor or Lessees, nor prevent Lessor from thereafter enforcing any such Rules and Regulations against any or all of the Lessees of the Shopping Center.

21.    These Rules and Regulations are in addition to, and shall not be construed to in any way modify, alter or amend, in whole or in part, the terms, covenants, agreements and conditions of any lease of premises in the Shopping Center. As to any Lessee, in event of any conflict between the provisions of thhese Rules and Regulations and of that Lessee's written lease agreement, the terms of the lease shall prevail.

22.    Lessor reserves the right to make such other and reasonable rules and regulations as in its judgment may from time to time be needed for the safety, care and cleanliness of the Shopping Center and for the preservation of good order therein. (Lessee shall be notified in writing of any rule change.)

- 3 -

EXHIBIT E



EXHIBIT F

GENERAL NOTES TO SIGN CRITERIA:

1. The graphics and letter style for each sign shall not be limited to that shown, but should reflect the character of the shop it identifies. Design approval will be based upon compatibility with storefront design, and with regard for character of overall development.

2. Signs shall conform to dimensions, configurations, and materials as shown hereon. Signs shall be mounted as indicated on this drawing and centered on the bay where practical.

3. All fluorescent fixtures shall have a wet location label (by Owner)

4. All work must be of good quality. Architect reserves right to reject any work judged below standard.

5. Sign contractor's design drawings shall be submitted to Architect, and to the Owner for approval prior to construction. All signs shall be approved by local authorities as required by local ordinance. No sign drawings shall be submitted to local authorities for approval without first obtaining approval of the Architect.

6. No banners, pennants, or temporary signs may be displayed on any building or in the parking area, and no temporary signs may be placed on the inside surfaces of any window. Tenant may use its standard window lights and window advertising.

SIGN 'A'

Signs shall be composed of individual interior illuminated metal can letters with plexiglass faces, 6" deep by 18" high. Length shall be determined by sen content, with a maximum size of as shown on drawings. Alphabet shown is only a recommended letter style, not required. Individual letter face color will be plexiglass. Plexiglass colors shall be : Yellow #2016, Orange #2119, Red #2415, Blue #2114 or other as approved by Architect. Plexiglass background shall be Ivory #2146.

SIGN 'B'

Signs shall be interior illuminated aluminum cabinet with plastic faces, 5'6" radius x 8" deep mounted as shown on drawing. The bottoms shall be constructed of heavy gauge aluminum. Sign cans be anodized dark bronze. Sign face shall be colored plexiglass letters and logo translucent , background opaque colors. Logo and letter style as selected by tenant and approve by Architect.

SIGN 'C'

Signs shall be plexiglass letters on plexiglass background with wood border as detailed on drawing. Plexiglass colors shall be : Yellow #2016, Orange #2119, Red #2415,Blue #2114 or other as approved by Architect. Plexiglass background shall be Ivory #2146.

Lessee must install, at his own cost, either Sign 'A' or 'B' (on outside of canopy) where appropriate, and Sign 'C' (under canopy).

EXHIBIT " Z "
ADDITIONAL PROVISIONS
BAY 511 CORPORATION, LANDLORD
~~SUBWAY INC., TENANT~~

1. `IMPROVEMENTS TO LEASED PREMISES

Landlord shall finish the premises to tenant's specifications in
a condition, design, and quality approved by landlord and tenant.
Landlord and tenant shall agree upon a mutually acceptable
licensed general contractor who will submit written plans,
specifications, and a cost estimate.  The landlord shall fund in
progress payments an allowance of up to $27,000.00 for the work
to be performed as per the plans and specifications.  All
specifications shall conform to the specifications in Exhibits
"C" and "F" of this lease.  All work in excess of the $27,000.00
tenant allowance shall be paid by tenant.

2.  OUTSIDE SEATING

Tenant shall have the right to install, at tenant's expense,
outdoor seating.  Prior to using the outdoor seating, tenant must
submit for landlord approval a written plan showing the exact
location and detail of the outdoor seating.

3.  NEON SIGNAGE

Tenant shall have the right to install, at tenant's expense, neon
style signage. Prior to installation, tenant must submit written
plan for landlord approval.

4.  CONTINGENCY

This lease is contingent upon the landlord obtaining a written
lease termination from Cyrus Mesbah lease dated January 16, 1989.

5.  "AS IS" CONDITION

Tenant is aware the trade fixtures in the leased premises will be
removed prior to delivery of premises to tenant. Tenant will then
accept the premises in an "as is" condition.



EXHIBIT AD

AGENCY DISCLOSURE

RE:  Contract for property described as:

    5015 South McCarran Blvd. Reno, NV.
    located within the Smithridge Plaza Shopping Center

Situated in the County of ___Washoe___, Nevada, dated
___June 29,1990___ between ___SUBWAY REAL ESTATE CORP.___,
as (___) Purchaser OR (_X_) Lessee (Check One) and
___Bay 511 corporation_____, as
(___) Seller OR (_X_) Lessor (Check One).

    The Nevada Real Estate Division, effective July 1, 1989,
requires that "In each real estate transaction involving a
licensee, as agent or principal, the licensee shall clearly
disclose, in writing, to the buyer and seller and the lessor
and lessee, his relationship as the buyer's agent or the
seller's agent. . . ."  (NAC 645)

    In compliance with this requirement, Commercial Property
Services (CPS), and the licensee named below, has notified
the parties to this transaction of their agency relationship
with the parties.  The parties named below acknowledge that
they have been informed of the agency relationship of CPS,
its employees, licensees and sub-agents in this transaction.

    The Parties understand that CPS must deal fairly and
honestly with all parties to a transaction but must
represent, and negotiate in the best interest of, its
"client" named below.

CLIENT: ___Bay 511 Corporation___

CPS LICENSEE: ___Deborah E. Brown___

SUB-AGENT: ___Sheila D Brown___

OTHER BROKER: ___None___

    REPRESENTING: ___N/A___

OTHER PARTIES: ___N/A___

Purchaser/Lessee

_____

Date: _____

Seller/Lessor

Date: __9/26/40____  __9/26/90__

ADDENDUM B

Extention of Term:

(1) Provided that Tenant shall have fulfilled completely and timely the terms and conditions of this Lease, providing Tenant has not assigned or sublet his premises in whole or in part, Tenant shall have the right to extend the term of this Lease for One (1) additional five (5) year period (s) under the same terms and conditions as the original Lease. It is understood that this/these option (s) is/are unique to Subway Inc. , and up-on any assignment or sub-letting, with or without Owner's consent, the op-tion (s) shall be rendered null and void.

(2) During the first ( ) five (5) year option period (s), the monthly minimum fixed rental payable for the first year of the five year option period (s) shall be the market rental for this particular leased premises as determined mutually between Tenant and Owner as in paragraph (4) below. After the rental for the first year of the five year option period (s) is established, the rental shall be increased at the beginning of the thirteenth (13) month of the option Term and annually thereafter. The formula for increasing the rent annually shall be determined by Tenant and Owner as in paragraph (4) below.

(3) In order to exercise such option(s) to renew or extend this Lease, Tenant shall give to Owner notice, In writing, of his Intention to do so at least one hundred eighty (180) days prior to expiration of this Lease, and if Tenant shall fail to give such notice within said time limit, all rights and privileges as granted to Tenant to renew or extend this Lease shall thereupon be null and void.

(4) If the Tenant shall exercise the option(s) to extend the term as set forth herein, then the minimum monthly fixed rental shall be agreed upon by the parties in writing. If the parties are unable to agree on the rental dur-ing the first sixty (60) days of the one hundred eighty (180) day notifica tion period, then the monthly fixed rental shall be determined by arbitration subject to provisions of this section.

(5) Within fifteen (15) days after the expiration of such sixty (60) day period, each party shall appoint a duly qualified real estate broker with a well known firm who has at least five (5) years experience, and who spicalizes in retail leasing and sale of retail commercial properties to act as an arbitrator. Within fifteen (15) days thereafter, the two arbitrators so appointed shall appoint a third person similarly qualified to act as the third arbitrator. If the two arbitrators appointed by the parties are unable to agree on the third arbitrator, then the parties hereto (or either of them) shall dilli-gently apply to the Presiding Judge of Superior Court in the State of Nevada , County of Washoe , for the appoint-ment of such a person. Within thirty (30) days after appointment of the third arbitrator, the three arbitrators shall determine the market rental for the space taking into account the terms of this Lease, the location of the Shopping Center and its major tenants and the market rental value of similar space within the Shipping Center, and the amount so determined shall be used as the basis for a computation by them of the monthly fixed minimum rental hereunder. In the event the arbitrators are unable to reach a unanimous agreement, the vote of two shall control and the decision of the arbitrators shall be final and binding upon the parties hereto. Owner and Tenant shall each bear one-half of the cost of the arbitration.

(6) Pending such substitution of adjusted rental, the monthly fixed rental shall be equal to that paid in the last year of the original term, and upon the agreement being reached as to the new rental then the previous rental shall be retroactively adjusted and paid within thirty (30) days of such agreement.

Rider to Lease dated the _26_ day of _September_____,
1990, made by and between BAY 511 CORPORATION, Landlord, and
SUBWAY Real Estate Corp., a corporation organized under the laws
of Delaware for the purpose of leasing property for franchisees
of Doctor's Associates, Inc., Tenant.  The premises will be known
as:

                         Smithridge Plaza
                         Reno, Nevada

Notwithstanding any clause in this lease to the contrary, the
following will prevail:

R1.  Within 14 days of subletting or assigning this lease to any
bona-fide SUBWAY licensee of Doctor's Associates, Inc. without
the prior consent of the Landlord tenant shall notify landlord of
such sublet or assignment.   Such assignment or subletting shall
not alter the Tenant's responsibility to the Landlord under this
lease, and the assignee or subtenant's use of the premises shall
be limited to the use set forth in this Lease.  Landlord agrees
to accept rent from the Tenant, its assignee or sublessee.
Irrespective of whether this lease is assigned or the premises
sublet, the Tenant and the assignee, but no other entity or
individual including, but not limited to, Doctor's Associates,
Inc., shall remain responsible for the full performance of all
the terms and conditions of the lease.

R2.  Landlord shall maintain in good condition the roof, walls,
foundations, walks, driveways, parking areas and the structural
portion of the Leased Premises except when damaged by Tenant.

R3.  Landlord represents that the heating and air conditioning
systems, plumbing, hot water heater, and electrical systems in
the premises will be in compliance with all local building codes,
in good working order and that the roof will be free from leaks
upon the commencement of the term of this lease.

R4.  This lease and Tenant's obligation to pay rent are
contingent upon Tenant's ability to procure upon first
application the necessary approvals, permits and licenses from
appropriate governmental authorities to utilize the leased
premises as a restaurant for on and off premises consumption.

R5.  Landlord will give written notice to Tenant within fifteen
(15) days of any default committed under this lease by a
Sublessee or Assignee of the Tenant.  Failure to give notice in a
timely manner constitutes a waiver of monetary and non-monetary
claims against the Tenant with respect to, and only with respect
to, the particular default of which Tenant was not given timely
notice.  Any notice which is to be given to Tenant hereunder



shall be deemed sufficiently given if sent by Certified or Registered Mail, postage prepaid, to Tenant at the leased premises and at 325 Bic Drive, Milford, Connecticut, 06460-3059, Attention: Legal Department. Landlord's address shall be: C/O Commercial Property Services, 955 W. Moana Lane, Reno, Nevada 89509.

R6. Landlord grants permission to the Tenant to construct the premises in accordance with the standard SUBWAY decor and to erect standard SUBWAY signs provided Tenant complies with local codes and ordinances in construction and installation of same. All signs shall also comply with Exhibit F of the lease.

R7. If at any time under the provisions of this lease the consent of the Landlord is required, it shall not be unreasonably withheld.

R8. In the event the Leased Premises is taken by eminent domain, Tenant is hereby granted permission to make its own claim against the condemning authority for loss of business and fixtures.

R9. In the event of litigation between the Landlord and the Tenant relative to rights, obligations and duties of either party under this lease, attorney's fees and costs shall be paid by the non-prevailing party.

R10. Either party shall, upon ten (10) days written request of the other, execute, acknowledge and deliver to the other, a short form Memorandum of the lease for recording purposes. All costs and expenses related thereto shall be borne by the party requesting the Memorandum.

R11. In the event Landlord shall fail, refuse or neglect to make repairs in accordance with the terms of this lease, or if Tenant is required to make any repairs by reason of any act, omission or negligence of the Landlord or its employees or agents, Tenant shall have the right, at its option, to make such repairs on the behalf of and for the account of the Landlord and deduct the cost and expense thereof from the next installment(s) of rent due. Landlord shall have thirty (30) days to perform repair from notice by Tenant.

R12. Landlord shall not lease to any other submarine sandwich restaurants. This does not apply to existing tenants in center at the time of execution of this lease.

R13. If tenant should terminate this lease prior to its lease expiration, tenant shall be subject to the following damages:

  1. Any default or termination prior to two years and six months into the lease term, tenant shall reimburse the landlord for leasing commission plus eighteen months rental at the current rental schedule at the time of default.

2.    Any default or termination after two years and six months tenant shall reimburse the landlord for leasing commissions plus twelve months rental at the current rental schedule at the time of default.

R14.    If the demised premises are not ready for occupancy by Tenant within one (1) year of the final execution of this lease agreement, Tenant shall have the option of terminating this lease by giving Landlord written notice.

R15. The individual who executed this lease has done so solely as agent for the Tenant in the exercise of the power and authority conferred on it by the Tenant.    It is expressly understood and agreed that nothing in this lease will be construed as creating any liability whatsoever against said individual and without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenant, either express or implied, herein contained to the end that the Tenant will be solely responsible therefor.

R16.    Landlord and Tenant agree that this offer to lease is open for acceptance by the Landlord for thirty (30) days following execution by Tenant.    In the event the Landlord does not execute this lease within thirty (30) days of execution by Tenant, this offer shall be null and void and Landlord shall promptly return any and all monies paid by Tenant.

R17.    Landlord acknowledges that Landlord has made his own examination of the Tenant and is not relying upon any representation from any person or entity related to the Tenant. Further, Landlord represents that there are no oral agreements affecting this lease; this lease supersedes and cancels any and all previous negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties as stated by including but not limited to, Tenant's agent(s), employee(s), Subway's franchisee(s), and/or Subway's Development Agent(s).

WITNESS:

LANDLORD:
Bay 511 Corporation

_An agent for Bay 5th Corporation_

_____

WITNESS:

TENANT:
Subway Real Estate Corp.

9/17/90

STEPHENS FRANCHISE FINANCE

LANDLORD DISCLAIMER AND WAIVER
OF INTEREST IN LEASED PERSONAL PROPERTY

The undersigned is the Landlord of the Premises located at:

Physical Description:              5015 S. McCarran St.
                                   Reno, NV  89502

Legal Description:                 _____

_____
_____

As an inducement to Stephens Franchise Finance, ("SFF") to finance
the personal property ("Equipment") covered by a Contractual Sales
Agreement between SFF and R. B. Piper & Assoc., Inc. ("Buyer"), and
in consideration of the sum of One Dollar ($1.00) and other good
and valuable consideration, receipt of which is hereby
acknowledged, the undersigned Landlord hereby consents to the
installation of the acknowledged, the undersigned Landlord hereby
consents to the installation of the Equipment and disclaims any
title or right therein by reason of such installation; and agrees
the Equipment shall remain personal; and waives and relinquishes
unto Lessor and its assignees all right of levy or distraint for
rent, all right to claim that the Equipment is or will at any time
become a fixture or fixtures, and all rights, claims, and demands
of every kind against the Equipment and all replacements thereof
and additions thereto.  This disclaimer and waiver shall continue
in full force and effect until Borrower has paid the full amount
owing and fulfilled all obligations in accordance with the terms
and conditions of the Contractual Sales Agreement stated above, and
any renewals, Extensions, and/or substitutions thereof.  Further,
the undersigned Landlord hereby consents to the removal of the
equipment from the premises stated above, whether such removal is
occasioned by an event of default or termination of the Contractual
Sales Agreement stated above.✷ This waiver may not be altered or
amended without the written consent of SFF, shall be binding upon
the heirs, personal representatives, successors, mortgagees, and
assignees of the undersigned, and shall be effective as of the date
of delivery and/or installation of the Equipment at the premise
stated above. ✷ *SFF will be responsible for any damage
caused by the removal of the equipment.*

Dated this __26th__ day of __OCTOBER__, 19__92__.

LANDLORD

_____
(Authorized Signature & Title)

Jeffrey Debnam          Steven W. England
Vice President          Vice President

LANDLORD NAME AND ADDRESS:

_____
_____
_____



STEPHENS FRANCHISE FINANCE

LANDLORD DISCLAIMER AND WAIVER
OF INTEREST IN LEASED PERSONAL PROPERTY

The undersigned is the Landlord of the Premises located at:

Physical Description:                    5015 S. McCarran St.
                                         Reno, NV 89502

Legal Description:                       _____

_____

_____

As an inducement to Stephens Franchise Finance, ("SFF") to finance the personal property ("Equipment") covered by a Contractual Sales Agreement between SFF and Leland C. Larson d/b/a Subway Sandwiches & Salads ("Buyer"), and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned Landlord hereby consents to the installation of the Equipment and disclaims any title or right therein by reason of such installation; and agrees the Equipment shall remain personal; and waives and relinquishes unto Lessor and its assignees all right of levy or distraint for rent, all right to claim that the Equipment is or will at any time become a fixture or fixtures, and all rights, claims, and demands of every kind against the Equipment and all replacements thereof and additions thereto. This disclaimer and waiver shall continue in full force and effect until Borrower has paid the full amount owing and fulfilled all obligations in accordance with the terms and conditions of the Contractual Sales Agreement stated above, and any renewals, extensions, and/or substitutions thereof. Further, the undersigned Landlord hereby consents to the removal of the equipment from the premises within 30 days notice of default, whether such removal is occasioned by an event of default or termination of the Contractual Sales Agreement stated above. SFF will be responsible for any damage caused by the removal of the equipment. This waiver may not be altered or amended without the written consent of SFF, shall be binding upon the heirs, personal representatives, successors, mortgagees, and assignees of the undersigned, and shall be effective as of the date of delivery and/or installation of the Equipment at the premise stated above.

Dated this ____18+h____ day of ___December___ ,19 _91____ .

                                    BAY 511 CORPORATION

                                    _____
                                    (Authorized Signature & Title)
                                    Jeff Debnam, Vice President

                                    _____
LANDLORD NAME AND ADDRESS:          Steven W. England, Vice President

Bank of America - IRE 9320
560 Davis Street
San Francisco, CA 94111
As Agent for Bay 511 Corporation

STEPHENS FRANCHISE FINANCE

LANDLORD DISCLAIMER AND WAIVER
OF INTEREST IN FINANCED PERSONAL PROPERTY

The undersigned is the Landlord of the Premises located at:

Physical Description:  5015  S.  McCARRAN  ST.

| | | |
|---|---|---|
| Street Address | | |
| RENO | NV | 89502 |
| City | State | Zip |

Legal Description:

As an inducement to Stephens Franchise Finance, ("Seller") to finance the personal property ("Equipment") covered by a Sales Contract between Seller and  STEVEN  V.  RYCKEBOSCH  ("Buyer"), and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned Landlord hereby consents to the installation of the Equipment and disclaims any title or right therein by reason of such installation; and agrees the Equipment shall remain personal; and waives and relinquishes unto Seller and its assignees all right of levy or distraint for rent, all right to claim that the Equipment is or will at any time become a fixture or fixtures, and all rights, claims, and demands of every kind against the Equipment and all replacements thereof and additions thereto. This disclaimer and waiver shall continue in full force and effect until Buyer has paid the full amount owing and fulfilled all obligations in accordance with the terms and conditions of the Sales Contract stated above, and any renewals, extensions, and/or substitutions thereof.  Further, the undersigned Landlord hereby consents to the removal of the equipment from the premises stated above, whether such removal is occasioned by an event of default or termination of the Sales Contract stated above. This waiver may not be altered or amended without the written consent of Seller, shall be binding upon the heirs, personal representatives, successors, mortgagees, and assignees of the undersigned, and shall be effective as of the date of delivery and/or installation of the Equipment at the premise stated above.

Dated the _____ ii _____ day of _Carrie_, 19 _96_ _____.

LANDLORD

_Louise W. Chan_ _____  _Roy Weilder_  V.P.
Name  _Bank of America ITE Bna_ (Authorized Signature & Title)  _As Agent for Bty 511 Corp_
_520 Davis St._ _____  _(415) 622-1717_
Street Address                Phone

_San Francisco   CA   94111_
City, State, Zip

_STEVEN  V.  RYCKEBOSCH_
Name of Franchisee/Tenant

**EXHIBIT 2**

**<u>EXHIBIT 2</u>**

<u>**SEVENTH AMENDMENT TO LEASE**</u>

THIS SEVENTH AMENDMENT TO LEASE (hereinafter this "Amendment") is made and entered into this _____26-Aug-2016_____ (hereinafter the "Effective Date") by and between **ALTIS CARDINAL AJU SMITHRIDGE LLC, a Florida limited liability company** ("Lessor") and **SUBWAY REAL ESTATE, LLC** ("Lessee").

## RECITALS

A.      Altis Cardinal AJU Smithridge LLC is a successor of Meyer Smithridge 1996 LLC, a successor of Meyer Properties, a successor of Bay 511 Corporation.  Any reference to the term "Lessor" includes Altis Cardinal AJU Smithridge LLC as successor Lessor.  Subway Real Estate, LLC is a successor of Subway Real Estate Corp., a successor of Subway West, Inc., successor to Subway Real Estate Corp. Any reference to the term "Lessee" includes Subway Real Estate, LLC as successor Lessee.

B.      Lessor and Lessee entered into that certain Lease dated August 29, 1990, as amended by that certain Amendment to Lease dated January 9, 1991, as further amended by that certain Second Amendment to Lease dated July 3, 1995, as further amended by that certain Third Amendment of Lease dated December 29, 1997, as further amended by that certain Fourth Amendment of Lease dated August 23, 2000, as further amended by that certain Fifth Amendment of Lease dated November 25, 2003, as further amended by that certain Sixth Amendment to Lease dated August 5, 2011, as further modified by that certain letter agreement dated July 28, 2016 (collectively, the "Lease"), pursuant to which Lessor leased and demised to Lessee, and Lessee leased from Lessor, those certain Premises containing 1,088 square feet,  commonly known as 5015 South McCarran Boulevard, Reno, Nevada, located within Smithridge Plaza.

C.      Lessor and Lessee mutually desire to modify and amend the Lease in accordance with the provisions contained hereinbelow.

**NOW, THEREFORE,** for considerations hereinafter mentioned, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee covenant and agree as follows:

1.      <u>Representation and Warranty of the Parties</u>. Each party hereby represents and warrants to the other party that, as of the date hereof, to its knowledge, the other party is in full compliance with all of such party's obligations under the Lease and that such party has not breached any of its obligations thereunder.  Lessee hereby agrees and acknowledges that, except as otherwise specifically set forth in the Work Letter Agreement attached hereto as <u>Exhibit A</u> and incorporated herein by this reference, Lessee's occupancy of the Premises during the Renewal Term shall be based on the current "As Is" condition of the Premises.

2.      <u>Extension of Term</u>. Commencing on February 1, 2017, Lessor and Lessee hereby agree to extend, and hereby do extend the term of the Lease for an additional five (5) years, to and including January 31, 2022 (the "Renewal Term").

3.      <u>Monthly Rent</u>.  Commencing February 1, 2017, the Monthly Minimum Rent for the

2

Renewal Term shall be as follows and will be payable pursuant to the provisions of the Lease:

> <u>February 1, 2017 through January 31, 2018</u>:  Thirty-Four Thousand Four Hundred Forty-Eight and 40/100 Dollars ($34,448.40) per year and Two Thousand Eight Hundred Seventy and 70/100 Dollars ($2,870.70) per month.

> The Monthly Minimum Rent provided for herein shall be adjusted annually throughout the Lease Term, including the Option Term, as applicable, commencing on February 1, 2018 and annually thereafter (each such date an "Adjustment Date"). On each Adjustment Date, the Monthly Minimum Rent will increase to an amount equal to one hundred two percent (102%) of the Monthly Minimum Rent in effect immediately preceding such Adjustment Date.

4.    <u>Option to Renew</u>.  Provided that Lessee is not in default under this Lease and Lessee is occupying the entire Premises at the time of such election, Lessee shall have the right to one (1) extension of the Term of this Lease for a period of five (5) years (the "Option Term") on the terms and conditions set forth in this paragraph 4. Any reference in this Lease to the "Term" shall be deemed to include the Option Term if validly exercised by Lessee. Lessee shall exercise such Option Term, if at all, by written notice to Lessor not earlier than twelve (12) months nor later than six (6) months before the expiration of the Renewal Term. The Option Term shall be on the same terms and conditions contained in this Lease, except as follows:

> (a)    The Monthly Minimum Rent for the first year of the Option Term will be increased to an amount equal to one hundred and two percent (102%) of the Monthly Minimum Rent in effect immediately preceding such Option Term. On each annual anniversary of the commencement date of such Option Term, the Minimum Monthly Rent shall increase by two percent (2%);

> (b)    Lessee shall have no further rights to extend the Lease Term; and

> (c)    Lessor shall lease to Lessee the Premises in their then-current condition, and Lessor shall not be responsible for any improvements or providing to Lessee any allowances or other tenant inducements including, without limitation, moving allowance, construction allowance, and the like.

> Lessee's rights under this paragraph 4 shall, at Lessor's election, terminate if: (i) this Lease or Lessee's right to possession of any of the Premises is terminated, (ii) Lessee assigns any of its interest in this Lease or sublets any portion of the Premises except as permitted in the Lease, or (iii) Lessee fails to timely exercise its extension option hereunder, time being of the essence with respect to Lessee's exercise thereof.

5.    <u>Miscellaneous</u>.

> (a)    This Amendment shall be binding upon, and shall inure to the benefit of Lessor and Lessee and their respective heirs, executors, personal representatives, administrators, successors and assigns.

> (b)    This Amendment represents the complete understanding between the parties hereto as to the subject matter hereof, and supersedes all prior negotiations, representations,

warranties, promises, statements or amendments, either oral or written, among the parties hereto as to the subject matter hereof.

(c)    This Amendment may only be amended by a written instrument executed by both Lessor and Lessee.

(d)    This Amendment may be executed by the parties hereto in separate counterparts, all of which when delivered, shall together constitute one and the same instrument.

(e)    Except as expressly modified hereby, the Lease shall remain unamended and in full force and effect and is hereby ratified and confirmed by the parties hereto.

(f)    The faxed or e-mailed signature of any party shall be binding upon such party.

(g)    Except as otherwise defined herein, all capitalized terms herein shall have the same meaning as defined in the Lease.

[Signatures on following page]

**IN WITNESS WHEREOF,** the parties have signed and sealed this Amendment to Lease as of the day and year first above written.

LESSEE:

**SUBWAY REAL ESTATE, LLC,**
**a Delaware limited liability company**

By: _Christopher J. Kan_
     7D629B7E50054A6...

Its: **Duly Authorized**

Name: **Christopher J. Kan**

Date: 26-Aug-2016

LESSOR:

**ALTIS CARDINAL AJU SMITHRIDGE LLC,**
**a Florida limited liability company**

By: _Frank Guerra_
     FEE999F702314F9...

Its: Manager

Name: Frank Guerra

Date: 26-Aug-2016

## EXHIBIT A

## WORK LETTER AGREEMENT

A.     <u>Lessor's Work</u>.  Lessor is leasing the Premises to Lessee "as is," without any obligation to alter, remodel, improve, repair or decorate any part of the Premises.

B.     <u>Allowance for Cost of Work</u>.

     1.     Lessee shall be entitled to a one-time tenant improvement allowance (the "Allowance") in the amount of Ten Thousand and 00/100 Dollars ($10,000.00) for the costs relating to the initial design and construction of the Lessee's Work (defined below).  In no event shall Lessor be obligated to make disbursements pursuant to this Work Letter in a total amount which exceeds the Allowance.  Lessor shall only be obligated to make disbursements pursuant to this Work Letter for the cost of Lessee's Work, described herein below.  In the event the final cost of the Lessee's Work is less than the Allowance, the remaining balance of the Allowance may be used by Lessee as a credit toward its rental obligations under the Lease.

     2.     Subject to the provisions of this Work Letter, within thirty (30) days following completion of Lessee's Work, Lessor shall reimburse Lessee for the actual and documented costs and expenses paid by Lessee for completion of Lessee's Work, which reimbursement shall be in an amount up to, but not exceeding the Allowance, provided that: (i) Lessee delivers to Lessor a request for payment, in a form to be approved by Lessor, detailing the Lessee's Work that was completed; (ii) Lessee delivers evidence of all paid invoices from all of Lessee's contractors and suppliers for labor rendered and materials delivered to the Premises for Lessee's Work; (iii) Lessee delivers to Lessor properly executed final lien releases; (iv) Lessor has determined that no substandard Lessee's Work exists which adversely affects the mechanical, electrical, plumbing, HVAC, life-safety or other systems of the Premises, common areas or building of which the Premises is a part; (v) Lessee's architect delivers to Lessor a certificate, in a form reasonably acceptable to Lessor, certifying that the construction of Lessee's Work in the Premises has been substantially completed in accordance with the final Drawings and Specifications; and (vi) Lessee delivers all other information reasonably requested by Lessor.

     3.     Any payment by Lessor shall not be deemed Lessor's approval or acceptance of the Lessee's Work, as furnished or materials supplied as set forth in Lessee's payment request.

C.     <u>Lessee's Work</u>.

     1.     <u>Generally</u>. All work required to complete and place the Premises in finished condition for opening of business shall be performed by Lessee at Lessee's sole cost and expense with all due diligence, which work shall hereinafter be referred to as "Lessee's Work", and Lessee agrees to commence Lessee's Work within thirty (30) days following the Effective Date of this Amendment.

     2.     <u>Applicable Law</u>. The project is being developed under the jurisdiction of the

City of Reno, County of Washoe, State of Nevada, and federal safety codes. All design and construction work shall comply with all applicable statutes, ordinances, regulations, laws and codes, and Lessor's design criteria for Lessee's Work previously delivered to Lessee. Notwithstanding anything herein to the contrary, Lessee shall not commence any work on the Premises at any time during any early occupancy period or the Term, including Lessee's Work, without first complying with Lessee's Alteration, as set forth below:

UPON EXECUTION OF THIS AMENDMENT, LESSEE ACKNOWLEDGES THAT LESSOR MAY EXECUTE A NOTICE OF NON-RESPONSIBILITY AND MAY RECORD THE SAME WITHIN THREE (3) DAYS OF EXECUTION OF THIS AMENDMENT PURSUANT TO NEVADA REVISED STATUTES ("NRS") 108.234. LESSEE FURTHER AGREES THAT, AT LEAST TEN (10) DAYS PRIOR TO ENTERING INTO CONTRACT WITH ANY PRIME CONTRACTOR INTENDING TO PERFORM ALTERATIONS, AND PRIOR TO THE COMMENCEMENT OF ANY WORK RELATING TO THE PREMISES, LESSEE SHALL COMPLY WITH THE REQUIREMENTS OF NRS 108.2403 AND NRS 108.2407 REGARDING POSTED SECURITY, SHALL PROVIDE LESSOR WITH EVIDENCE OF SUCH COMPLIANCE, AND SHALL NOTIFY LESSOR IN WRITING OF THE NAME AND ADDRESS OF ANY SUCH PRIME CONTRACTOR TO ENABLE LESSOR TO PROPERLY SERVE THE RECORDED NOTICE OF NON-RESPONSIBILITY UPON THE PRIME CONTRACTOR PURSUANT TO NRS 108.234. LESSEE HEREBY ACKNOWLEDGES THAT LESSEE IS REQUIRED TO COMPLY WITH THE TERMS OF THIS PARAGRAPH AND THE PROVISIONS OF NRS 108.2403 AND (TO THE EXTENT LESSEE ESTABLISHES A CONSTRUCTION DISBURSEMENT ACCOUNT PURSUANT TO NRS 108.2403) 108.2407 PRIOR TO COMMENCEMENT OF ANY WORK OF IMPROVEMENT TO BE CONSTRUCTED, ALTERED OR REPAIRED ON THE PREMISES (SUCH OBLIGATIONS ARE COLLECTIVELY REFERRED TO AS THE "LESSEE'S ALTERATION OBLIGATIONS").

*CJK*

_____
LESSEE'S INITIALS

Where conflict exists between building codes, utility regulations, statutes, ordinances, other regulatory requirements and Lessor's requirements, as set forth herein, the more stringent of the requirements shall, at Lessor's option, govern.

3. Licenses and Permits. All permits, licenses and approvals for Lessee's Work shall be obtained by Lessee or its contractor prior to the commencement of construction and shall be posted in a prominent place within the Premises as required by the agency issuing the permit.

4. Approval of Plans. Lessor's written approval shall be obtained by Lessee prior to submitting plans for purposes of obtaining any required governmental permit or approval, and the undertaking of any construction work which deviates from Lessee's Drawings and Specifications, as approved by Lessor, or the undertaking of any modifications whatsoever to Lessor's building shell and/or utilities and other work not explicitly shown on said Drawings and Specifications. Lessor's approval of the foregoing shall not constitute the assumption of any responsibility by Lessor for the accuracy or sufficiency thereof, and Lessee shall be solely responsible therefor.

5.   <u>Contractors</u>. All contractors engaged by Lessee shall be bondable, licensed contractors, possessing good labor relations, capable of performing quality workmanship and working in harmony with Lessor's general contractor and other contractors on the job. All work shall be coordinated with the general project work.

6.   <u>Field Conditions</u>. Lessee shall inspect, verify and coordinate all field conditions pertaining to the Premises from time to time prior to the start of its store design work, through its construction, including its fixturing and merchandising.  Lessee shall advise Lessor immediately of any discrepancies with respect to Lessor's drawings.   Any adjustments to the work arising from field conditions, not apparent on Lessee's drawings and other building documents, shall require the prior written approval of Lessor. Lessor reserves the right to require changes in Lessee's Work when necessary by reason of code requirements or building facility necessity, field conditions, or directives of governmental authorities having jurisdiction over the Premises, or directives of Lessor's insurance underwriters.

7.   <u>Public Safety</u>.   Lessee shall confine the construction work to within the Premises as much as possible and shall work in an orderly manner removing trash and debris from the project on a daily basis.  At no time will pipes, wires, boards or other construction materials cross public areas where harm could be caused to the public.  The requirements of "Occupational Safety and Health Administration" (OSHA) prepared by the Department of Labor will govern.  If Lessee fails to comply with these requirements, Lessor may cause remedial action as deemed necessary by Lessor to protect the public.  All costs of said remedial action shall be charged to Lessee and shall become Lessee's responsibility.

8.   <u>Lessee Damage to Construction</u>.   Lessee will be required to furnish the necessary ramps, coverings, etc., to protect Lessor's facilities and adjoining premises from damage.  All costs to repair damage to Lessor's facilities and to adjoining premises will be at the expense of Lessee.  Actual repair work may be accomplished by Lessor at Lessor's option.

9.   <u>Drawings and Specifications</u>.

(a)  Within thirty (30) days of the Effective Date of this Amendment, Lessee shall prepare and submit to Lessor for approval an interior completion plan, design drawings, working drawings and specifications necessary to complete Lessee's Work ("Drawings and Specifications").  As soon as practicable after receipt of such Drawings and Specifications, Lessor shall return to Lessee such Drawings and Specifications with its suggested modifications and/or approval.  If, upon receipt of Lessor's modified Drawings and Specifications, Lessee wishes to take exception thereto, Lessee may do so within five (5) days from the date on which Lessee receives Lessor's modified Drawings and Specifications.   Unless such action is taken by Lessee, it will be deemed that all modifications made by Lessor on the Drawings and Specifications are acceptable to and adopted by Lessee.

(b)  Upon Lessor's approval in all respects of all such Drawings and Specifications, Lessee shall cause Lessee's Work to be diligently completed and installed

or such installations or alterations to be performed, as the case may be, in accordance with the Drawings and Specifications approved by Lessor, and no deviation from said Drawings and Specifications shall be made without Lessor's prior written approval. Lessee shall obtain all necessary permits in connection with the installation of such Lessee improvements and the performance of such work prior to the commencement of any work.

(c) If Lessee's Work entails any structural changes to the Premises, Lessee shall submit detailed structural plans, and Lessor's review of such plans shall be at Lessee's expense, provided that such expense shall not exceed One Thousand and 00/100 Dollars ($1,000.00). Moreover, Lessee shall not be permitted to commence any Lessee's Work until all plans applicable thereto have been approved in writing by Lessor.

(d) At any time during the Lease Term, any and all modifications by requiring alterations to the architectural, mechanical, electrical, fire protection or structural systems will require Lessee to supply detailed working drawings and appropriate calculations covering those modifications to Lessor for written approval. Interior painting, wall covering, carpeting and placement of movable trade fixtures are considered normal maintenance items and do not require Lessor approvals, but otherwise meet the requirements of this Work Letter. All other alterations require Lessor's written approval.

(e) Lessor's approval or inspection of any of Lessee's plans, shop drawings, etc., so submitted is made for identification purposes only and neither Lessor, nor its agents, servants or employees shall have any liability in any respect to any inadequacies, deficiencies, errors or omissions or non-complying features contained in any or all of Lessee's preliminary plans or final plans or Lessor's comments in respect to same.

D.     Insurance.  Lessee shall secure, pay for and maintain or cause its contractor(s) to secure, pay for and maintain during the construction of Lessee's Work and any periods of construction performed by Lessee during the Lease Term, the following insurance in the following amounts, which shall be endorsed in all policies to include Lessor and its beneficiaries, employees and agents as insured parties, and which shall provide in all policies that Lessor shall be given thirty (30) days' prior written notice of any alteration or termination of coverage in the amounts as set forth below, and such insurance as may from time to time be required from city, county, state or federal laws, codes, regulations or authorities, together with such other insurance as is reasonably necessary or appropriate under the circumstances:

1.  Lessee and Lessee's general contractor and subcontractor(s) required minimum coverages and limits of liability:

(a) Worker's Compensation as required by state law and Employer's Liability Insurance with limits of not less than One Million and 00/100 Dollars ($1,00,000.00) and any insurance required by any employee benefit acts or other statutes applicable where the work is to be performed as will protect the contractor and subcontractors from any and all liability under the aforementioned acts.

(b) Comprehensive General Liability Insurance (including Contractor's Protective Liability) with a combined single limit (bodily injury and property damage) of

not less than Two Million and 00/100 Dollars ($2,000,000.00) per occurrence and in the aggregate. Such insurance shall provide for explosion, collapse and underground coverage and contractual liability coverage and shall insure the general contractor and/or subcontractors against any and all claims for personal injury, including death resulting therefrom, and damage to the property of others and arising from his operations under the contract, whether such operations are performed by the general contractor, subcontractors or any of their subcontractors, or by anyone directly or indirectly employed by any of them. Such insurance policy shall include (i) a products/completed operations endorsement; (ii) endorsements deleting the employee exclusion on personal injury and the liquor liability exclusion; and (iii) a cross-liability endorsement or a severability of interest clause. Such insurance shall be primary and Lessor's insurance shall be excess insurance only.

(c) Comprehensive Automobile Liability Insurance, including the ownership, maintenance and operation of any automotive equipment, owned, hired and non-owned in an amount not less than Two Million and 00/100 Dollars ($2,000,000.00) combined single limit (bodily injury and property damage) per occurrence and in the aggregate. Such insurance shall insure the general contractor and/or subcontractors against any and all claims for bodily injury, including death resulting therefrom, and damage to the property of others arising from his operations under the contract, whether such operations are performed by the general contractor, subcontractor or any of their subcontractors, or by anyone directly employed by any of them.

(d) Builder's Risk Insurance -- Completed Value Builder's Risk Damage Insurance Coverage or similar course of construction coverage. Lessee shall provide an "All Physical Loss" Builder's Risk insurance policy on the work to be performed for Lessee in the Premises as it relates to the building within which the Premises are located. The policy shall include as insureds Lessee, its contractor and subcontractors, and Lessor, as their respective interests may appear within the Premises and within one hundred feet (100') thereof. The amount of insurance to be provided shall be one hundred percent (100%) replacement cost.

2. All such insurance policies required under this Exhibit, except as noted above, shall include Lessor, Lessor's agents and beneficiaries, Lessor's on-site representatives, Lessor's architect, and Lessor's general contractor, as additional insureds; except Worker's Compensation Insurance, which shall contain an endorsement waiving all rights of subrogation against Lessor, Lessor's architect and Lessor's general contractor, Lessor's agents and beneficiaries.

3. The insurance required under this Exhibit shall be in addition to any and all insurance required to be provided by Lessee pursuant to the Lease.

E. <u>Trash Removal</u>. During the construction, fixturing and merchandise stocking of the Premises, Lessee shall provide trash removal at areas designated by Lessor. It shall be the responsibility of Lessee and Lessee's contractors to remove all trash and debris from the Premises on a daily basis and to break down all boxes and place all such trash and debris in the containers supplied for that purpose. If trash and debris are not removed on a daily basis by Lessee or Lessee's contractor, then Lessor shall have the right to remove such

trash and debris or have such trash and debris removed at the sole cost and expense of Lessee.

F.    <u>At Completion of Lessee's Work</u>.  Lessee will provide Lessor with the following within thirty (30) days following substantial completion of Lessee's Work:

1.    A Certificate of Occupancy prior to opening for business.

2.    Unconditional Waivers of Liens and Sworn Statements in such form as may be required by Lessor from all persons performing labor and/or supplying materials in connection with such work showing that all parties have been paid in full.

3.    Submission by Lessee to Lessor of detailed breakdown of Lessee's final and total construction costs, together with receipted invoices showing payment thereof.

4.    Submission by Lessee to Lessor of warranties for not less than one (1) year against defects in workmanship, materials and equipment as required in this Exhibit.

5.    Submission by Lessee of a statement wherein Lessee agrees to indemnify Lessor against any and all liens against the Premises or any claims by any materials suppliers, contractors, or subcontractors.

6.    Lessee shall furnish a copy of the License to do Business.

7.    "As-Built" Drawings of all permanent Lessee Work performed.

8.    Recordation of a validly recorded Notice of Completion pursuant to NRS 108.228.



## Certificate Of Completion

Enve ope Id: BB79E11BC6DA4DCC9D1580EE2533EBB4                                          Status: Comp eted
Subject: SUBWAY - DEV - Store# 10118 Amendment for Execut on
Source Enve ope:
Document Pages: 10                          S gnatures: 2                               Enve ope Or g nator:
Cert f cate Pages: 3                        In t a s: 1                                 Mon ca Rem szewsk
AutoNav: Enab ed                                                                        325 Sub Way
Enve opeId Stamp ng: Enab ed                                                            M ford, CT  06461
T me Zone: (UTC-05:00) Eastern T me (US & Canada)                                       rem szewsk  m@subway.com
                                                                                        IP Address: 65.215.93.238

## Record Tracking

Status: Or g na                             Ho der: Mon ca Rem szewsk                   Locat on: DocuS gn
         26-Aug-16   09:04                          rem szewsk  m@subway.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Chr stopher J. Kan<br>kan  c@subway.com<br>Du y Author zed<br>Secur ty Leve : Ema  , Account Authent cat on (None) | *Christopher J. Kan*<br>—7D629B7E50054A6...<br><br>Us ng IP Address: 65.215.93.238 | Sent: 26-Aug-16   09:10<br>V ewed: 26-Aug-16   09:41<br>S gned: 26-Aug-16   09:41 |
| E ectron c Record and S gnature D sc osure:<br>    Accepted: 26-Aug-16   09:41<br>    ID: a1a158ec-b1e7-48a7-ac5f-b712f0a2a16d | | |
| Frank Guerra<br>fguerra@a t s  c.com<br>Manager<br>Secur ty Leve : Ema  , Account Authent cat on (None) | *Frank Guerra*<br>—FEE999F702314F9...<br><br>Us ng IP Address: 76.110.73.30 | Sent: 26-Aug-16   18:17<br>V ewed: 26-Aug-16   18:18<br>S gned: 26-Aug-16   18:18 |
| E ectron c Record and S gnature D sc osure:<br>    Accepted: 26-Aug-16   18:18<br>    ID: d21fb669-fca4-432b-a562-e894998a0c62 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Megan Fogarty<br>mfogarty@ho  andhart.com<br>Secur ty Leve : Ema  , Account Authent cat on (None) | **COPIED** | Sent: 26-Aug-16   18:17<br>V ewed: 28-Aug-16   12:57 |
| E ectron c Record and S gnature D sc osure:<br>    Accepted: 26-Aug-16   18:10<br>    ID: e4e2ed3e-7afc-4be3-a270-cd1c3893f8ea | | |

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Enve ope Sent | Hashed/Encrypted | 26-Aug-16  18:17 |
| Cert f ed De  vered | Secur ty Checked | 26-Aug-16  18:18 |
| S gn ng Comp ete | Secur ty Checked | 26-Aug-16  18:18 |
| Comp eted | Secur ty Checked | 26-Aug-16  18:18 |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 2/24/2015 7:40:45 PM
Parties agreed to: Christopher J. Kan, Frank Guerra, Megan Fogarty

Case 20-50471-btb    Doc 13    Entered 05/05/20 15:38:18    Page 68 of 68

Electronic Signature Disclosure

Franchise World Headquarters, LLC (we, us or our) may be required by local law to provide you certain written disclosures and documents related to communicating electronically. Please read the following information. By proceeding forward and checking the I AGREE box you are agreeing that you have reviewed the following electronic signature disclosure and consent to transact business using electronic communications and to utilize electronic signatures in lieu of using paper documents. Moreover, by checking such box in connection with this disclosure, you confirm that you can access and read this electronic consent to electronic receipt of documents for execution; and you can print, save or send this disclosure to a place for future reference and access.

Scope of Consent: This electronic signature service is provided by DocuSign, Inc. (DocuSign) on our behalf. You agree to receive electronic notices, disclosures, authorizations, acknowledgements and electronic signature documents with all related documents provided over the course of your relationship with us through your DocuSign Express user account (Account), as permitted by local law. Use of DocuSign and your Account requires a Windows 2000 or Windows XP operating system, Internet Explorer 6.0, Mozilla FireFox 1.0, NetScape 7.2 or above web-browser, 800 x 600 screen resolution, access to a valid email account and Adobe or similar software to view PDF documents. Moreover, users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection and allow per session cookies. These minimum requirements are subject to change.

Withdrawing Consent: You may withdraw your consent to receive electronic documents at any time. In order to withdraw consent you must notify us that you wish to withdraw consent and to provide your future documents in paper format. To indicate to us that you wish to withdraw consent, you must use the DocuSign Withdraw Consent form on the signing page of your Account. Once consent is withdrawn, you will no longer be able to use your Account to receive electronic documents or sign documents electronically.

Paper Copies: You are not required to receive documents or sign documents electronically and may request paper copies of documents at any time. You also have the ability to download and print any documents we send you through your Account for a limited period of time (usually 30 days) after such documents are first sent to you. If you wish to receive paper copies in lieu of electronic documents you may request paper copies from us by following the procedures outlined below. We may charge you a fee for the paper copies.

Requesting paper copies, withdrawing consent and updating contact information: To request paper copies of documents, withdraw consent to conduct business electronically or update your contact information please contact us by telephone, postal mail, or by sending an email to SubwayDocusignAdmin@subway.com with the following subjects:

Requesting Paper Copies. Please provide your name, email address, telephone number, postal address, document title and franchise number.

Withdraw Consent. Please provide your name, email address, telephone number, postal address, document title and franchise number.

Update Contact Information. Please provide your name, email address, telephone number, postal address, document title and franchise number.

We may charge you a fee in connection with your request for paper copies or withdrawal of your consent.